[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *League of Women Voters of Ohio v. Ohio Redistricting Comm.*, Slip Opinion No. 2022-Ohio-1235.]

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports. Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2022-OHIO-1235

LEAGUE OF WOMEN VOTERS OF OHIO ET AL. *v*. OHIO REDISTRICTING COMMISSION ET AL.

BENNETT ET AL. *v*. OHIO REDISTRICTING COMMISSION ET AL.

OHIO ORGANIZING COLLABORATIVE ET AL. *v*. OHIO REDISTRICTING COMMISSION ET AL.

[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *League of Women Voters of Ohio v. Ohio Redistricting Comm.*, Slip Opinion No. 2022-Ohio-1235.]

*Redistricting—Original actions under Ohio Constitution, Article XI—The Ohio Redistricting Commission's third revised plan violates Article XI, Sections 6(A) and 6(B) of the Ohio Constitution—Third revised plan is invalid—The Ohio Redistricting Commission shall be reconstituted, convene, and draft and adopt an entirely new plan in conformity with the Ohio Constitution.*

(Nos. 2021-1193, 2021-1198, and 2021-1210—Submitted April 8, 2022—Decided April 14, 2022.)

ORIGINAL ACTIONS filed pursuant to Ohio Constitution, Article XI, Section 9.

**Per Curiam.**

## I. INTRODUCTION

{¶ 1} For the fourth time, we are called upon to consider the validity of a General Assembly–district plan adopted by respondent Ohio Redistricting Commission. The commission adopted three General Assembly–district plans between September 2021 and February 2022. We invalidated each of those plans because they did not comply with Article XI, Sections 6(A) and 6(B) of the Ohio Constitution. *See League of Women Voters of Ohio v. Ohio Redistricting Comm.*, ___ Ohio St.3d ___, 2022-Ohio-65, ___ N.E.3d ___, ¶ 2 ("*League I*"); *League of Women Voters of Ohio v. Ohio Redistricting Comm.*, ___ Ohio St.3d ___, 2022-Ohio-342, ___ N.E.3d ___, ¶ 67-68 ("*League II*"); *League of Women Voters of Ohio v. Ohio Redistricting Comm.*, ___ Ohio St.3d ___, 2022-Ohio-789, ___ N.E.3d ___, ¶ 2 ("*League III*"). Each time, we ordered the commission to be reconstituted and to adopt a new plan in conformity with the Ohio Constitution. *League I* at ¶ 138; *League II* at ¶ 67; *League III* at ¶ 44. In *League III*, we ordered the commission to draft and adopt an entirely new General Assembly–district plan by March 28, 2022. *League III* at ¶ 44-45.

{¶ 2} The commission adopted its fourth plan—the "third revised plan"—on March 28. Petitioners[1] have filed objections to that plan, arguing that it violates the standards of Article XI, Sections 6(A) and 6(B). We hold that petitioners have shown beyond a reasonable doubt that the third revised plan violates Article XI,

---

1. Petitioners in Supreme Court case No. 2021-1193 are the League of Women Voters of Ohio, the A. Philip Randolph Institute of Ohio, and six individual voters: Tom Harry, Tracy Beavers, Valerie Lee, Iris Meltzer, Sherry Rose, and Bonnie Bishop. Petitioners in Supreme Court case No. 2021-1198 are ten individual voters: Bria Bennett, Regina C. Adams, Kathleen M. Brinkman, Martha Clark, Susanne L. Dyke, Carrie Kubicki, Meryl Neiman, Holly Oyster, Constance Rubin, and Everett Totty. Petitioners in Supreme Court case No. 2021-1210 are the Ohio Organizing Collaborative, the Ohio chapter of the Council on American-Islamic Relations, the Ohio Environmental Council, and six individual voters: Pierrette Talley, Samuel Gresham Jr., Ahmad Aboukar, Mikayla Lee, Prentiss Haney, and Crystal Bryant.

Sections 6(A) and 6(B). We again order the commission to be reconstituted and to adopt a new plan in conformity with the Ohio Constitution. We decline to order the other remedies that petitioners seek in their objections.

## II. BACKGROUND

### A. The commission retains independent map drawers

{¶ 3} In *League III*, we noted, "The commission has *adopted* three plans so far, but it still has not *drafted* one." (Emphasis sic.) *Id.* at ¶ 25. The previous plans had been drafted by staff members of the offices of respondents President of the Senate Matt Huffman and Speaker of the House Robert Cupp, who controlled the process and did not allow the Democratic members of the commission to participate in the creation of the plans. *Id.* at ¶ 25, 27, 30. We said that "[t]he commission should retain an independent map drawer—who answers to all commission members, not only to the Republican legislative leaders—to draft a plan through a transparent process." *Id.* at ¶ 30. We also said that "the drafting should occur in public and the commissioners should convene frequent meetings to demonstrate their bipartisan efforts to reach a constitutional plan within the time set by this court." *Id.* at ¶ 44.

{¶ 4} On March 18, two days after we decided *League III*, __ Ohio St.3d __, 2022-Ohio-789, __ N.E.3d __, Ohio Attorney General Dave Yost issued a memorandum to the commission proposing a framework for complying with our decision. In it, the attorney general noted our language in *League III* suggesting that the commission "should" retain an independent map drawer. The attorney general recognized that we "used 'should' and not 'shall' " but nevertheless advised the commission that "it would be wise to treat this suggestion with the degree of deference one might pay to the suggestions of one's spouse." Accordingly, the attorney general recommended hiring a "bipartisan duo" of consultants whose "charge should be simply to produce a map that complies with the Ohio Constitution and the orders of the Ohio Supreme Court."

{¶ 5} In response to *League III*, the commission met on Saturday, March 19, and discussed different options for going forward. Its ideas included (1) having the map drawers for the Republican and Democratic legislative caucuses—which included Ray DiRossi and Blake Springhetti, who are employees of the Republican legislative caucuses, and Chris Glassburn, who is a consultant retained by the Democratic legislative caucuses—work together to draw a new district plan, (2) hiring mediators or independent map drawers, including the two suggested by the attorney general,[2] or (3) combining those approaches. The commission delegated to its cochairs, respondents House Speaker Cupp, who is a Republican commission member, and Senator Vernon Sykes, who is a Democratic commission member, the task of recommending independent map drawers and mediators. The commission also decided that in the interim, the map drawers for the legislative caucuses and staff for each commission member would meet to discuss how they could work with independent map drawers. Thus, it became clear to anyone following the commission's proceedings that the commission had accepted this court's and the attorney general's recommendations to engage independent map drawers to craft a General Assembly–district plan.

{¶ 6} At the commission's next meeting, on Monday, March 21, Senator Sykes recommended Dr. Michael McDonald, a professor at the University of Florida, to serve as an independent map drawer. House Speaker Cupp recommended Dr. Douglas Johnson, the president of National Demographics Corporation, to serve as

---

2. The attorney general's March 18 memorandum to the commission stated that he had *already retained* two consultants who had collaborated to produce maps for the state of Virginia and were prepared "to go to work immediately" for the commission. The duo consisted of Sean Trende, a Republican analyst with the political-news website RealClearPolitics, and Bernie Grofman, a Democratic professor of political science at the University of California at Irvine. Respondent House Minority Leader Allison Russo expressed concern that Trende had served as a consultant for respondents in this litigation. But after speaking with Grofman and Trende, Leader Russo and Senator Sykes were in favor of the commission's engaging them, as suggested by the attorney general. However, Senate President Huffman later indicated that the two experts either were not available or were unwilling to travel to Ohio to complete the work.

4

the other independent map drawer. Both individuals had previously consulted on redistricting issues in other states. The commission unanimously voted to approve the hiring of Dr. McDonald and Dr. Johnson as independent map drawers. The commission agreed to pay Dr. McDonald and Dr. Johnson each at an hourly rate of $450, plus their related expenses, capped at $49,000 each.

**B. The commission meets daily and livestreams the map-drawing process**

*1. The March 22 meeting*

{¶ 7} On Tuesday, March 22, the commission decided on a daily meeting schedule through Saturday, March 27. The commission then unanimously approved retaining two mediators employed by the United States Court of Appeals for the Sixth Circuit. The commission members discussed instructions for the independent map drawers—who would be arriving the following day—but could not come to an agreement regarding the instructions and decided to continue that discussion at the next meeting.

*2. The March 23 meeting*

{¶ 8} Dr. McDonald and Dr. Johnson appeared at the Wednesday, March 23 meeting and introduced themselves to the commission. The commission members engaged in a lengthy discussion about written instructions for the independent map drawers and adopted 24 "Ground Rules." Among other things, the rules specified that the independent map drawers were to draft the district plan at the commission's direction and in conformity with Article XI and this court's prior decisions, draft an entirely new plan without considering prior plan proposals or previous work product, and provide regular updates to the commission at its scheduled meetings. The rules also provided a process for resolving any disputes between Dr. McDonald and Dr. Johnson, including mediation if the commission were unable to unanimously resolve the dispute. In addition, the rules specified that all map drawing would occur in a designated room at the statehouse and would be livestreamed by the Ohio Channel. The commission members were expected to provide feedback and guidance to the

map drawers at commission meetings. Also, each commission member and their staff would have unlimited access to the map drawers, so long as the map drawers were not separately contacted.

### 3. The March 24 meeting

{¶ 9} The independent map drawers began working on Thursday, March 24. Their workroom was livestreamed so that the public could observe the process. During the March 24 commission meeting, Dr. McDonald and Dr. Johnson updated the commission on their progress, which, after some technical delays, had included drafting potential House districts in Franklin County. The map drawers sought guidance from the commission on a few issues, including how it wanted them to define a "toss up" district. Although several commission members opined on how they would define such a district, the commission did not reach an agreement. Senator Sykes said that the commission would get back to the independent map drawers on that issue. Near the end of the meeting, Senator Sykes noted that livestreaming the map-drawing process and the commission's open discussion about map-drawing principles were "historic" for Ohio and the nation.

### 4. The March 25 meeting

{¶ 10} On Friday, March 25, the independent map drawers presented to the commission preliminary draft maps of potential House districts in Franklin and Union Counties; Cuyahoga, Lake, and Summit Counties; and Hamilton County. The map drawers acknowledged that they had not yet started on Senate maps. Some of the commission members had questions and comments for the map drawers. For example, respondent Auditor of State Keith Faber expressed concerns about the shapes of the districts in the maps and said that the map drawers should focus not only on Article XI, Section 6(B)'s "mystery ratio"—i.e., the proportionality standard—but also on Article XI's other requirements, including Section 6(C)'s compactness requirement. Both map drawers indicated that they hoped to have complete drafts to the commission by Saturday afternoon.

6

*5. The March 26 meeting*

**{¶ 11}** At the Saturday, March 26 meeting, the independent map drawers reported that they had created two sketches of district plans for the commission's consideration. One of the sketches included both a House map and a Senate map, while the second sketch included only a House map. Dr. McDonald said that both sketches were proportional—meaning that the House maps had 45 Democratic-leaning House seats and 54 Republican-leaning House seats.

**{¶ 12}** Senate President Huffman moved the commission to insert the addresses of the 33 Senate members into the maps and requested that the map drawers consider those addresses in the map-drawing process. Senate President Huffman acknowledged that such considerations were not constitutionally required but explained why he thought they were important. Specifically, he noted that 16 current senators are in midterm and are therefore constitutionally entitled to serve out their terms; the goal, he said, should be to ensure that those senators continue to reside in the districts they represent. He further said that for the 17 remaining Senate seats, 11

senators are seeking reelection and had already filed candidacy petitions.[3][4]  It should also be a commission goal, Senate President Huffman said, to draw those senators into a district in which they can seek reelection—i.e., *not* into a district currently represented by a senator in midterm.

{¶ 13} Senator Sykes and House Minority Leader Russo objected to adding incumbents' addresses to the maps, and House Minority Leader Russo cited this court's observation in *League III* that protecting incumbents is not grounded in Article XI.  *See* ___ Ohio St.3d ___, 2022-Ohio-789, ___ N.E.3d ___, at ¶ 37-38.  But Auditor Faber said that there is value in incumbency and that although protecting incumbents is not a "primary constitutional factor," the map drawers should avoid placing incumbents together "where [they] can."  House Speaker Cupp agreed that the map drawers should make every effort to avoid drawing incumbents together when it was possible to do so without violating other constitutional requirements.  The commission members agreed to take the issue to mediation.

---

3. However, by this time, respondent Secretary of State Frank LaRose had already issued Directive No. 2022-31, dated March 23, 2022, instructing the boards of elections as follows: "Candidates' petitions for Ohio House, Ohio Senate, or State Central Committee were certified based on the February 24, 2022 General Assembly district plan.  Due to the Supreme Court's decision in [*League III*], *by operation of law, a board's decision to certify or reject those candidates' petitions for the May 3, 2022 Primary Election is null and void.*  Board members must acknowledge this on the record at their next board meeting."  (Emphasis added.)  Secretary of State Directive No. 2022-31, at 2, Instruction III: "Consequence for Certified Candidates for Ohio House, Ohio Senate, and State Central Committee."

Secretary of State directives are issued pursuant to R.C. 3501.05(B) and 3501.053, and boards of elections are legally bound to carry out elections consistently with these directives.  R.C. 3501.11(E).  Thus, Senate President Huffman's suggestion that the map drawers should aim to protect incumbent senators who had already filed petitions was baseless.  These senators' candidacies had already been invalidated by another member of the redistricting commission—the secretary of state—because their petitions had been filed in districts determined to be unconstitutional by this court.

4. Further, consideration of already-filed petitions for districts deemed unconstitutional was, in effect, a violation of the "Ground Rules" for the independent map drawers, which prohibited them from including or considering General Assembly–district plans or proposals created before March 23, 2022.

{¶ 14} The independent map drawers sought guidance from the commission on several issues. They again asked for clarification about how to define a toss-up district for purposes of determining whether there is a disparity in the number of such districts between the two political parties. After some discussion, the commission agreed to add that issue to the mediation list. At one point in the meeting, Dr. Johnson said that in their "quest to get as close to symmetry" as possible, they were "kind of blowing through compactness." He asked what balance they were supposed to strike between symmetry and compactness. Auditor Faber again cautioned the map drawers not to focus solely on Article XI, Section 6(B) but to also comply with Sections 6(A) and 6(C). In the end, the commission members expressed that it was difficult to answer the map drawers' questions without having a complete and consolidated district plan before them.

### 6. *The March 27 meeting*

{¶ 15} On March 27—one day before this court's deadline for submitting a new plan—Dr. McDonald and Dr. Johnson presented three district plans to the commission: two drafted by Dr. McDonald and a third drafted by Dr. Johnson. They indicated that they had not yet had the chance to consolidate their ideas into one unified proposal and that they were still seeking the commission's guidance on outstanding issues. Dr. Johnson again noted a trade-off between achieving symmetry of toss-up districts and drawing compact districts and expressed his preliminary belief that creating more Republican-leaning toss-up districts would lead to a less compact plan. Dr. McDonald disagreed and said that there was no trade-off, noting that his sketch achieved exact symmetry of toss-up districts and was more compact than Dr. Johnson's. But in response to questions from Auditor Faber about splitting cities into multiple House districts, Dr. McDonald acknowledged that the "puzzle pieces don't fit together very well" and that "the geography is extremely challenging in Ohio."

{¶ 16} After lengthy discussion and a recess, some commission members offered suggestions in response to the map drawers' questions about which counties should be paired together. But the commission did not decide any issue by a formal vote. Several members indicated that they needed more information and did not want to vote on how certain areas should be drawn without understanding the ramifications for other parts of the state.

{¶ 17} In addition, House Speaker Cupp advised the map drawers that the commission had reached a mediated resolution about the issue of considering incumbents. Senate President Huffman read a mediation agreement that provided the following:

Upon completion of the independent map drawers' merger of their independent versions of the House and Senate maps and prior to any presentation to the Commission, the independent map drawers shall consider the residence locations of non-term limited House and Senate incumbents, and Senate incumbents in mid-term, in drafting a Commission map, and where possible without violating constitutional principles, avoid pairing incumbents and also drawing districts such that Senators protected under Section 5 of Article 11 no longer live in the district they represent.

Incumbents will be identified as House or Senate and no other identifying information shall be used.

The commission unanimously adopted the mediation agreement. But later in the meeting, Senate President Huffman and Senator Sykes disagreed about its meaning.

**C. Senate President Huffman proposes an alternative plan**

{¶ 18} The commission next met on the morning of Monday, March 28. Dr. McDonald and Dr. Johnson reported that they had merged their maps to create a

unified proposed district plan. The plan, they said, was proportional for both the House and the Senate. With respect to the symmetry of toss-up districts, the plan had three Democratic-leaning and three Republican-leaning House districts with vote shares between 50 and 52 percent and two Democratic-leaning and zero Republican-leaning Senate districts with a vote share between 50 and 52 percent. They also reported that Dr. McDonald had started cleaning up splits of cities and townships and that Dr. Johnson had finished importing incumbents' addresses into their system. They planned to consider the incumbency issues next.

{¶ 19} The commission met again in the late afternoon that day. Dr. Johnson reported that they had adjusted most of the House map—except in northeast Ohio— to avoid incumbent pairings. They had not yet tackled the incumbency issues in the Senate, however, and said they would need a couple more hours. Dr. Johnson said that they were moving as fast as they could but that it was a slow process and that Ohio has "some of the most complicated geographic challenges, certainly the most strict geographic rules and also the most complicated Senate rules." Around 5:00 p.m., Dr. McDonald left the meeting—and the statehouse—so that he could return to Florida for a professional commitment.

{¶ 20} House Speaker Cupp and Auditor Faber expressed concerns about the independent map drawers' plan. Auditor Faber asked several questions about the compactness of the plan and noted that the map drawers had adopted the "hub and spoke model" by dividing the urban core of cities into different districts and drawing them with suburbs to create Democratic districts. Dr. Johnson acknowledged that "to hit that magic number, it involves a lot more work to draw those Democratic seats."

{¶ 21} Senate President Huffman also expressed concerns about the plan, stating that as of 5:00 p.m. on the day of the deadline, the map drawers had not yet produced a Senate map. He noted that after the commission adopted a plan, staff would need time to complete several administrative tasks; he said that to meet this

court's midnight deadline, the commission would need to adopt a plan no later than 10:30 p.m. Considering the approaching deadline, Senate President Huffman said that the commission needed a "failsafe." He introduced a motion that would allow Dr. Johnson to continue working on the independent map drawers' plan but also permit the Republican and Democratic legislative-caucus map drawers to jointly with Dr. Johnson or independently revise the commission's second revised plan so that the commission could timely comply with this court's order. Senate President Huffman emphasized that the commission must "have a product to vote on." In his words, "if we're not going to land the plane * * * it would be nice to have a parachute. And that's what the motion is intended to do."

{¶ 22} Senator Sykes and House Minority Leader Russo objected to the motion, citing the resources the commission had invested in the independent map drawers and noting that the map drawers were almost finished. House Minority Leader Russo opined that this court would rather have the commission finish its job than submit another unconstitutional plan. She suggested that the commission take the issue to mediation. Senate President Huffman, however, did not believe that mediation would be productive. Senator Sykes inquired about requesting an extension of time from this court, but Senate President Huffman and House Speaker Cupp said that *League III* prohibited any requests for extensions of time. The commission approved Senate President Huffman's motion by a vote of five to two, along party lines. The commission agreed to meet again at 9:00 p.m.

## D. The commission adopts a district plan drawn by Republican-caucus staff

{¶ 23} When the commission reconvened, Dr. Johnson reported that he had not yet finished the Senate map. He again said that the "Senate rules are extremely complex," that he had hit "roadblocks" necessitating changes to the House map, and that he needed at least another 45 minutes to finish. Senate President Huffman said that his staff had identified some improper splits in the independent map drawers' House map, including one in a Cleveland Heights district. Fixing the problem, Senate

President Huffman said, would cause the district to exceed the population requirements, which in turn would have "rippling effects" throughout northeast Ohio. Dr. Johnson responded that he was trying to "race through and get a map" and that he intended to run a few reports at the end of the process that would hopefully catch those errors but that he had not yet reached that step. Dr. Johnson also indicated that Auditor Faber had given him some larger-scale edits but that he would not have sufficient time to incorporate those changes before the deadline.

{¶ 24} House Speaker Cupp said that it was not feasible at that point to expect the independent map drawers to produce a complete and constitutional plan by this court's deadline. Therefore, he moved that the commission adopt his new proposal, which had just been distributed to the members. He said that compared to the second revised plan, his proposal improved the "symmetry measures" by reducing the number of Democratic-leaning toss-up districts by two in the House and by one in the Senate. And he said that the proposed plan was drawn in the livestreamed public workroom earlier that day.

{¶ 25} House Minority Leader Russo and Senator Sykes opposed the motion. House Minority Leader Russo called the motion a "farce," noted that the plan had again been drawn by only one party, and said that she had not been provided any information about the partisan leanings of the districts or symmetry of the toss-up districts. She also disputed House Speaker Cupp's claim that Springhetti had prepared the map in the livestreamed public workroom: "Mr. Springhetti sat in the map room for about 45 minutes, clicked his mouse around a few times and called that public and transparency. That's not public and transparency. This map was drawn long before this evening. I guarantee it." Senator Sykes added that instead of trying to assist the independent map drawers to cross the finish line, the "majority" had withdrawn from the process and then hijacked it. In response to questioning from House Minority Leader Russo, Auditor Faber, respondent Governor Mike DeWine, respondent Secretary of State Frank LaRose, and Senator Sykes acknowledged that

they had not seen House Speaker Cupp's proposal before it was distributed to all the commission members during the meeting.

{¶ 26} House Minority Leader Russo requested a recess to review House Speaker Cupp's proposal, but Senate President Huffman said that because it was already after 10:00 p.m., the commission needed to pass a plan to comply with this court's deadline. He further noted that Dr. Johnson had not yet completed a final Senate map and that Dr. Johnson admitted that he would not have time to include any amendments to his proposal by the midnight deadline. House Minority Leader Russo requested that the commission file an emergency motion in this court for a 12-hour extension of time. The commission, however, voted four to three to adopt House Speaker Cupp's plan—i.e., the third revised plan—as its final General Assembly–district plan. Because both Democratic members of the commission voted against the plan, the plan did not have the bipartisan support required by Article XI, Section 8(B) of the Ohio Constitution to remain in effect for ten years. Therefore, the plan would remain in effect for no more than four years. *See* Ohio Constitution, Article XI, Section 8(C)(1)(a).

{¶ 27} Senate President Huffman distributed the commission statement required by Article XI, Section 8(C)(2) of the Ohio Constitution. The statement said that the commission had gone to great lengths to comply with this court's decisions but that the independent map drawers were unable to produce a plan by the court's deadline. The statement further noted that to comply with the court's deadline, the commission had instructed staff to prepare a "modification" of the second revised plan that "more closely complies" with the court's decisions than did the second revised plan. The statement noted that the commission believed that the third revised plan met "strict proportionality" and "improved upon the number of asymmetric districts" identified in *League III*.

**E. Senator Sykes moves to adopt the independent map drawers' plan**

{¶ 28} The commission recessed to allow its members to review Senate President Huffman's Section 8(C)(2) statement and for Senator Sykes and House Minority Leader Russo to prepare their own statement. Upon reconvening, Senator Sykes moved the commission to adopt Dr. Johnson's plan, which Senator Sykes claimed had been completed. As part of his motion, Senator Sykes also requested that the commission refrain from dissolving for up to four weeks so that it could improve Dr. Johnson's plan. House Minority Leader Russo acknowledged that some commission members may have concerns about voting on a district plan without having an opportunity to review it. But she noted that the commission had just adopted a plan that was similarly distributed immediately before the commission's vote. In response, Senate President Huffman said that the third revised plan included "only minor changes" from the second revised plan and that the commission members were therefore familiar with "probably 97 percent" of the third revised plan.

{¶ 29} Other commission members also commented on the independent map drawers' work. House Speaker Cupp said that he noticed "some egregious compactness issues" in Dr. Johnson's plan. Governor DeWine indicated that although the independent map drawers had established proportionality and had created a similar number of toss-up districts, the independent map drawers' plan had a "compact district problem" with more split cities and fewer competitive districts. Governor DeWine noted that competitive districts was a goal of the constitutional amendment. Auditor Faber praised the work of the independent map drawers and emphasized the difficulty of their task given the short amount of time that they had. But he said that they could not incorporate his suggestions, that their plan appeared to unnecessarily split cities, and that they had engaged in cracking and packing to create more Democratic districts. The commission voted five to two against adopting Dr. Johnson's plan.

{¶ 30} Senator Sykes and House Minority Leader Russo submitted their separate statement, which said that the third revised plan had been drawn in secret

"in a bunker at the Bureau of Worker Compensation building,"[5] that they had received the plan only minutes before voting on it, and that it was merely a "tweaked version" of the second revised plan, which this court had invalidated. Auditor Faber also voted against adopting the third revised plan but did not concur in the statement of Senator Sykes and House Minority Leader Russo.

{¶ 31} On March 29, the commission notified this court that it had adopted a fourth General Assembly–district plan.

### F. Petitioners file objections

{¶ 32} On April 1, petitioners filed objections to the third revised plan, primarily criticizing the commission's process in adopting the third revised plan and arguing that the plan violates Article XI, Sections 6(A) and 6(B).[6] With their objections, petitioners collectively submitted three new expert reports. Some of the petitioners ask this court to issue additional remedies, including ordering the implementation of a specific General Assembly–district plan—such as the plan prepared by the independent map drawers—for the 2022 election.

{¶ 33} Respondents filed four separate responses to petitioners' objections. Senate President Huffman, House Speaker Cupp, Governor DeWine, and Secretary LaRose opposed petitioners' objections. Senate President Huffman and House Speaker Cupp submitted an affidavit from Dr. Johnson, who averred that his work had been "highly constrained" by Ohio's complex geography and constitutional rules and the limited window of time in which to draw the maps. He further stated that

---

5. Earlier during the March 28 commission meeting, Senator Sykes noted the absence of the Republican-caucus map drawers—i.e., DiRossi and Springhetti—who had been instructed to assist the independent map drawers. In response, Senate President Huffman indicated that DiRossi was ill and was working at the "BWC Building" on March 28. Senator Sykes and House Minority Leader Russo believed that DiRossi had drafted the plan that the commission ultimately adopted.

6. The petitioners in all three cases also filed motions on March 29 for an order directing respondents to show cause why they should not be held in contempt. Petitioners argue, among other things, that the commission violated this court's order in *League III* by failing to adopt an entirely new General Assembly–district plan. We dispose of these motions in separate entries announced today.

although he had made every effort to comply with Article XI's line-drawing requirements, he had not had time to conduct a detailed review or run reports to confirm whether the plan complied with Article XI. And he noted that his final plan included a portion of northeast Ohio that was drawn by Glassburn prior to March 23, 2022,[7] and a configuration for Mahoning County to which Republican commission members had objected but that Dr. Johnson had run out of time to fix. Dr. Johnson also acknowledged that he had run out of time to include revisions requested by commission members or to even allow the commission members or their staff to review the plan.

{¶ 34} Senator Sykes and House Minority Leader Russo filed responses to the objections that align with petitioners' positions. They also submitted their own affidavits as well as an affidavit from Glassburn. Senator Sykes stated in his affidavit that when the independent map drawers proposed maps that were proportional and symmetrical, Republican commissioners seemed "rattle[d]" and started to impede and discredit the process by complaining about compactness and the double-bunking of incumbents (i.e., placing two incumbents in the same district). House Minority Leader Russo averred that after the independent map drawers had made progress and sought guidance from the commission, her Republican colleagues refused to give it. She also averred that any double-bunking that had occurred in the map drawers' initial drafts was inadvertent—because they did not have incumbent information— all of which was the byproduct of drawing a constitutional map.

{¶ 35} Glassburn averred that in his opinion, the final plan submitted by Dr. Johnson complies with Article XI and its proportionality and symmetry requirements. He further averred that the independent map drawers' plan is more compact than the third revised plan and that to the extent that there are any technical

---

7. The "Ground Rules" for the independent map drawers prohibited them from including or considering General Assembly–district plans or proposals created before March 23, 2022.

flaws in the independently drawn plan, they could be easily remedied. Glassburn found no reason why the commission would need "more than a single day" to review the independent map drawers' plan and fix any technical flaws.

### III. ANALYSIS

#### A. The burden and standard of proof

{¶ 36} A district plan adopted by the commission is presumptively constitutional. *League I*, ___ Ohio St.3d ___, 2022-Ohio-65, ___ N.E.3d ___, at ¶ 76. Petitioners therefore have the burden of proving that the third revised plan violates the Constitution. *Id.* at ¶ 76-77. They must prove factual issues beyond a reasonable doubt. *Id.* We do not defer to the commission's legal interpretations. *Id.* at ¶ 80.

#### B. Article XI, Section 6(A)

{¶ 37} Article XI, Section 6(A) of the Ohio Constitution provides that the commission must attempt to meet the standard that "[n]o general assembly district plan shall be drawn primarily to favor or disfavor a political party." Section 6(A) "requires this court to discern the map drawers' intent." *League I* at ¶ 116.

*1. The process leading to the third revised plan*

{¶ 38} In *League III*, this court found that substantial and compelling evidence showed that the process leading to the adoption of the second revised plan was evidence of an intent to draw a General Assembly–district plan that favored the Republican Party at the expense of the Democratic Party. ___ Ohio St.3d ___, 2022-Ohio-789, ___ N.E.3d ___, at ¶ 24-32. That evidence included the following: (1) staff members of Senate President Huffman and House Speaker Cupp (rather than the commission members) drew the second revised plan, (2) the Democratic members of the commission had no opportunity to provide input and no meaningful opportunity to discuss or review the second revised plan or to propose amendments once it was presented to the commission, and (3) the map-drawing process was controlled by the Republican-legislative staffs. *Id.* at ¶ 25, 27. In *League II*, this

court found that the commission's choice to start with an invalidated plan "and change it as little as possible" was "tantamount to an intent to preserve as much partisan favoritism as could be salvaged from the invalidated plan." ___ Ohio St.3d ___, 2022-Ohio-342, ___ N.E.3d ___, at ¶ 38. The same could be said here.

{¶ 39} In this case, the evidence shows that the commission began to heed our suggestions in *League III*, consistent with the recommendations of the attorney general's March 18 memorandum to the commission, and that it made significant changes to its process. The commission retained independent map drawers and mediators, held meetings almost daily, ensured that the map drawers had a neutral set of written instructions, and allowed the public to observe the map-drawing process. Senator Sykes described these efforts as "historic" for Ohio and the nation. But what began as a "historic" process devolved into the same one-sided partisan map-drawing process that led us to invalidate the previous three plans.

{¶ 40} Although the commission retained independent map drawers and held frequent meetings throughout the 12-day map-redrawing period, the commission ultimately readopted a modified version of the second revised plan that we invalidated in *League III*. The evidence suggests that Springhetti, a staff member for the Republican legislative caucus, modified the second revised plan in one afternoon to produce the third revised plan. Neither Senator Sykes, House Minority Leader Russo, nor their staff had an opportunity to provide input concerning the creation of the third revised plan or a meaningful opportunity to review the proposal or provide amendments to it once it was presented to the commission. Instead, the Democratic commission members were forced to vote on the plan within minutes of receiving it, even though they had not been provided any documents showing the partisan leaning of the plan's districts. Further, Senator Sykes's and House Minority Leader Russo's requests for a recess were rebuffed, as were their requests to seek an extension of this

court's deadline.[8]  The Democratic commission members were once again excluded from the process of creating what the commission adopted as its third revised plan. And as in *League III*, the record indicates that the statewide-officeholder members of the commission did not participate in drawing the third revised plan: they stated that they had not seen a copy of the plan until it was distributed to all the members.

{¶ 41} Moreover, the third revised plan suffers from a similar fundamental flaw that we found obstructed the constitutionality of the plan we invalidated in *League II*.  In *League II*, we found that the principal drawers of the first revised plan "started with the same plan we invalidated and then merely adjusted certain districts just enough so that they could nominally be classified as 'Democratic-leaning.' " ___ Ohio St.3d ___, 2022-Ohio-342, ___ N.E.3d ___, at ¶ 36.  We observed that the commission's choice to start from an unconstitutional plan and "change it as little as possible" was "tantamount to an intent to preserve as much partisan favoritism as could be salvaged from the invalidated plan." *Id.* at ¶ 38.

{¶ 42} Despite our admonition in *League II*, the commission's self-described "parachute" was to have Springhetti use an invalidated plan and tweak it a bit.  The third revised plan is no more than a modification of the second revised plan and, as admitted by Senate President Huffman, includes "only minor changes" from its predecessor.  As before, the commission did not adopt a plan using a process that Article XI and this court's prior decisions require.

{¶ 43} We also discern intent of partisan favoritism from the timeline that led to the commission's decision to scrap the work of the independent map drawers in

---

8. Senate President Huffman and House Speaker Cupp took the position that our decision in *League III* forbade the commission from seeking an extension of time for adopting a plan and filing it with the secretary of state.  They cited language in *League III* indicating that "the clerk of this court shall refuse to file any requests or stipulations for extension of time." *League III* at ¶ 47.  In isolation, paragraph 47 of *League III* supported the refusal to seek an extension of time to allow Dr. McDonald and Dr. Johnson to complete their work.  However, it is not proper to read paragraph 47 in isolation; it should be read in context.  And in the paragraph prior to paragraph 47, we stated that untimely filings "under this paragraph" were prohibited. *Id.* at ¶ 46.  Paragraphs 46 and 47 refer to only the timeline for objections to the plan and responses to the objections. *See id.*

favor of a plan that included minimal changes to one already invalidated as unconstitutional. Particularly, the evidence shows that on the final day before the commission adopted its third revised plan, some members of the commission blocked, rather than facilitated, Dr. McDonald's and Dr. Johnson's efforts to finish their work. The timeline of events demonstrates convincingly that the commission— or at least some members of the commission—when faced with one or more plans that closely matched constitutional requirements in the form of Dr. McDonald's and Dr. Johnson's plans, reverted to partisan considerations when time was running short, even though the potential for successful completion was high.

{¶ 44} In Dr. Johnson's words, it became clear on March 28 that he and Dr. McDonald "were not going to finish a map before the Court's midnight deadline without more direct guidance from the Commission members' staff." This became apparent despite the fact that on March 27, Dr. McDonald and Dr. Johnson presented three district plans to the commission and sought the commission's guidance on outstanding issues to enable them to merge their ideas with the commission's into a final plan. As time for completion grew shorter, the commission failed to provide the guidance that Dr. McDonald and Dr. Johnson needed, hindering their ability to complete their work.

{¶ 45} Particularly problematic was Senate President Huffman's last-minute insistence that the independent map drawers consider the residence locations of non-term-limited and mid-term House and Senate incumbents in drafting a plan. The commission instructed the independent map drawers to consider incumbent residences "and where possible without violating constitutional principles, avoid pairing incumbents." Although this instruction was not necessarily inconsistent with this court's admonitions in *League III*, ___ Ohio St.3d ___, 2022-Ohio-789, ___ N.E.3d ___, at ¶ 37, because it required the map drawers to consider incumbency only "where possible," the timing of it pulled the rug out from under the independent map drawers. Rather than including the instruction in the March 23 "Ground Rules,"

this new criterion was imposed on March 27—one day before the deadline and after the independent map drawers had already completed separate drafts of potential district plans without consideration of incumbents' addresses. This belated instruction added to the map drawers' difficulty in finalizing their work in sufficient time for the commission to review it and file it with the secretary of state. Contrary to our admonitions in *League III*, the commission's last-minute incumbency-protection instruction to the independent map drawers effectively prioritized protecting incumbents over the requirements of Article XI, Section 6.

{¶ 46} Although the commission appeared to be engaging in a more collaborative process in drafting a legislative map, the final day leading up to the adoption of the third revised plan revealed anything but that. Rather than helping the independent map drawers finish their work on a plan, the commission instead chose to modify a previously invalidated plan. That plan was prepared by a member of the Republican legislative caucus's staff, and the Democratic commission members and the statewide-officeholder commission members were effectively prevented from participating in preparing the plan. These facts indicate beyond a reasonable doubt an intent to favor the Republican Party at the expense of the Democratic Party in the commission's fourth try at drafting the General Assembly–district plan.

*2. The third revised plan's substantive noncompliance with Article XI, Section 6(A)*

{¶ 47} In *League III*, we noted that the second revised plan contained 19 districts in which the Democratic vote share was between 50 and 52 percent with no comparably competitive Republican-leaning districts, resulting in the conclusion that "the 54 percent seat share for Republicans is a *floor* while the 46 percent share for Democrats is a *ceiling*—an observation similar to the one [this court] found persuasive in *League II*." *League III* at ¶ 32. We found that "[t]he remarkably one-sided distribution of toss-up districts is evidence of an intentionally biased map * * *." *Id*. at ¶ 33.

22

{¶ 48} In *League III*, ___ Ohio St.3d ___, 2022-Ohio-789, ___ N.E.3d ___, we found that this unequal distribution of highly competitive or "toss up" districts led to partisan asymmetry such that with a 50 percent statewide vote share, Republicans would win 53 percent of the House seats and that with the same share, Democrats would win approximately 44 percent of the House seats. *Id*. at ¶ 33. We noted Dr. Rodden's calculation that a 5 percent uniform swing in Republicans' favor would net them up to 23 additional seats, while a 5 percent uniform swing in Democrats' favor would net them, at most, two additional seats. *Id*. As we did in *League II*, this court in *League III* found that the "monolithically disparate" quality of partisan favoritism in the second revised plan overwhelmingly demonstrated that the plan's drafters intended to favor the Republican Party and disfavor the Democratic Party. *Id*. at ¶ 34.

{¶ 49} As discussed above, the third revised plan is merely the second revised plan with just a few alterations. Even Senate President Huffman described it as "probably 97 percent" of the previous map. Two of petitioners' experts, Dr. Michael Latner and Dr. Christopher Warshaw, calculate that regarding the House, only 451 census blocks out of more than 276,000 were assigned to a different district in the third revised plan, affecting only 0.265 percent of the total population. As Dr. Latner explains, "[o]therwise, the Second and Third Revised Plans are identical, which explains their similar performance." Dr. Warshaw calculates that regarding the Senate, only 270 census blocks out of more than 276,000 were assigned to a different district in the third revised plan, affecting only 0.2 percent of the total population. Thus, 31 of 33 Senate districts and 92 of 99 House districts are the same in the third revised plan as they were in the second revised plan. Another of petitioners' experts, Dr. Jonathan Rodden, explains that only a few district boundaries were moved in the Worthington/Upper Arlington area and in the Canton area, which shifted a few Democratic districts from just under a 52 percent Democratic vote share to just over a 52 percent Democratic vote share.

{¶ 50} The third revised plan is materially identical to the invalidated second revised plan on the measures this court looked to in *League III*. The two plans contain a nearly identical one-sided distribution of toss-up districts. The overall number of toss-up districts has been reduced from 26 to 23, but *all* those districts are Democratic-leaning districts and there are no similarly competitive Republican-leaning districts. The third revised plan is also asymmetrical in the same way that the second revised plan was. Dr. Latner calculates that with a 50 percent statewide vote share, Republicans would win 53 percent of the House seats while Democrats would win 44 percent—the same as his analysis of the second revised plan, *see League III* at ¶ 33.

{¶ 51} Dr. Latner further observed:

A small two percentage point shift in the electorate in favor of Republicans would be expected to wipe out 17 Democratic House seats and 6 Democratic Senate seats, giving Republicans 72% percent of House seats and 73% percent of Senate seats—a supermajority in both chambers. Equivalent shifts among voters in favor of Democrats would not yield any additional seats * * *."

(Emphasis deleted.) He further opined that, as before, the plan is structured to create a floor for Republicans and a ceiling for Democrats: "[S]imilar to the First and Second Revised Plans, the Third Revised Plan performs like a 'winner-take-all' gerrymander but with only a one-way ratchet in favor of Republicans." In *League III*, this court found such a structure to be persuasive evidence of an Article XI, Section 6(A) violation. __ Ohio St.3d __, 2022-Ohio-789, __ N.E.3d __, at ¶ 32.

{¶ 52} Senate President Huffman and House Speaker Cupp point out that the third revised plan improves upon the second revised plan. While this may be true, the improvement falls short of landing in constitutional territory. Dr. Latner notes,

"Compared to the Second Revised Plan, the number of seats where Democrats win 5 percent or more than their statewide vote average has increased by one, slightly improving symmetry, but consistent with each of the Commission's plans, Republicans maintain a substantial, and statistically significant, advantage." Similarly, regarding the Senate, the results mirror those of the second revised plan, with no more than marginal improvement in some sectors. The aggregate asymmetry in the assignment of toss-up districts remains strong evidence of an intentionally biased plan, as does the partisan asymmetry of the plan itself.

{¶ 53} Senate President Huffman and House Speaker Cupp argue that the third revised plan performs similarly to the rejected independent map drawers' plan in the event of a hypothetical 5 percent swing in either party's favor. They further argue that the independent map drawers' plan was not a commission-drawn plan, because the commission members did not have the opportunity to propose amendments. But they fail to explain how their assertions about the independent map drawers' plan relates to a Section 6(A) analysis or even how their actions and arguments negate the evidence of partisan intent with respect to the plan the commission actually adopted. Indeed, we found a Section 6(A) violation in *League III* without reference to or comparison with any of the proposed alternative plans. *See id.* at ¶ 24-37.

{¶ 54} Senate President Huffman and House Speaker Cupp also criticize the independent map drawers' plan for what they call "hub and spoke" districts, "where the map drawer slices into an urban core and 'spokes' the district out of the urban core into a rural or suburban area." They assert that these districts are noncompact and demonstrate that the third revised plan's "supposed asymmetry * * * is not unreasonable and that to achieve 'better' symmetry cities must be carved up like a pizza." But they cite no evidence or authority for the proposition that the "hub and spoke" districts they describe are not compact. And petitioners have submitted evidence showing that the independent map drawers' plan has better scores for

compactness under three different measures (Reock, Polsby-Popper, and Area/Convex Hull) than the third revised plan. Further, the independent map drawers' plan splits the same number of counties and fewer voting precincts than the third revised plan. Thus, petitioners have offered unrebutted evidence that the third revised plan is *less* compact than the independent map drawers' plan.

{¶ 55} In sum, the third revised plan has not materially changed from the invalidated second revised plan. The evidence supports the finding that the third revised plan violates Article XI, Section 6(A), just as we found with regard to the second revised plan in *League III*.

### C. Article XI, Section 6(B)

{¶ 56} Article XI, Section 6(B) of the Ohio Constitution requires the commission to attempt to draw a district plan to meet the constitutional requirement that "[t]he statewide proportion of districts whose voters, based on statewide state and federal partisan general election results during the last ten years, favor each political party shall correspond closely to the statewide preferences of the voters of Ohio." The statewide preferences of Ohio's voters "are 54 percent in favor of the Republican Party and 46 percent in favor of the Democratic Party." *League II*, __ Ohio St.3d __, 2022-Ohio-342, __ N.E.3d __, at ¶ 64.

{¶ 57} In *League II*, this court held that if the term "favor" is to be applied equally to both parties, "the quality and degree of favoritism in each party's allocated districts" may not be "grossly disparate." *Id*. at ¶ 61. We explained that while Section 6(B) does not "prohibit[] the creation of competitive districts," to give effect to the term "favor," such districts "must either be excluded from the proportionality assessment or be allocated to each party in close proportion to its statewide vote share." *Id*. at ¶ 62. We held that the revised plan at issue in *League II* violated Section 6(B), in part because that plan contained 12 competitive House districts with Democratic vote shares between 50 and 51 percent that the commission had counted

as Democratic districts, *id*. at ¶ 61, yet the plan contained zero such districts with similar Republican vote shares that were counted as Republican districts, *id*.

{¶ 58} In *League III*, this court held that the second revised plan violated Section 6(B) because it contained 26 districts (19 House districts and 7 Senate districts) with Democratic vote shares between 50 and 52 percent that the commission had counted as Democratic districts and zero such districts with similar Republican vote shares that were counted as Republican districts. __ Ohio St.3d __, 2022-Ohio-789, __ N.E.3d __, at ¶ 39, 42. We concluded that the 26 "so-called Democratic-leaning districts" did not "favor" the Democratic party and were instead "competitive" districts that must be excluded from the proportionality assessment. *Id*. at ¶ 41-42. In the second revised plan, 67.9 percent of the noncompetitive districts favored Republicans and 32.1 percent favored Democrats—leading us to conclude that the plan's allocation of districts favoring each political party did not closely correspond to the statewide preferences of the voters. *Id*. at ¶ 42.

{¶ 59} The third revised plan contains 23 districts (17 House districts and 6 Senate districts) with Democratic vote shares between 50 and 52 percent—three fewer than did the second revised plan. As before, the third revised plan contains zero districts with a Republican vote share between 50 and 52 percent. For the reasons explained in *League III*, *see id*. at ¶ 40-42, these 23 competitive districts should be excluded from the proportionality assessment. Therefore, in the third revised plan, 66.1 percent of the noncompetitive districts favor Republicans and 33.9 percent favor Democrats. The third revised plan's slight improvement over the second revised plan still leaves it far short of close correspondence with the statewide preferences of the voters. Indeed, this disproportionality is still greater than the original plan that we invalidated in *League I*, in which 64.4 percent of the districts favored the Republican Party. *See* __ Ohio St.3d __, 2022-Ohio-65, __ N.E.3d __, at ¶ 105.

{¶ 60} In reaching the conclusion in *League III* that the second revised plan's Democratic-leaning districts with vote shares under 52 percent were, in reality, "competitive districts," we considered evidence showing that these 26 competitive districts "represent[ed] the foundation of a politically asymmetric plan," in that a two-point statewide swing in the Republican Party's favor would result in that party winning 74 percent of the House seats and 79 percent of the Senate seats under the second revised plan, while the same two-point swing in the Democratic Party's favor would result in no seat gains for that party in either chamber. *League III* at ¶ 41. We find the same for the third revised plan: a statewide swing of 2 percent in the Republican Party's favor would sweep all the competitive districts into its column, while a similar swing in favor of the Democratic Party would earn it no additional seats.

{¶ 61} In their response to petitioners' objections, Senate President Huffman and House Speaker Cupp compare each party's seat share in the third revised plan and the independent map drawers' plan in the event of a *5* percent statewide vote swing in each party's favor. Their argument appears to be that the numbers look similar for both plans, so the asymmetry of the plans is similar. But Senate President Huffman and House Speaker Cupp fail to articulate how this comparison of the adopted plan with a nonadopted plan relates to the requirements of Article XI, Section 6(B). In other words, they do not explain how their analysis counters the conclusion that the third revised plan's 23 districts with Democratic vote shares between 50 and 52 percent do not actually "favor" the Democratic party in light of the plan's allocation of zero such districts to the Republican Party.

{¶ 62} The third revised plan violates Article XI, Section 6(B) of the Ohio Constitution for the same reasons that the second revised plan did.

### D. Remedies

{¶ 63} Because the commission and its third revised plan did not and do not comply with Article XI, Sections 6(A) and 6(B), we declare the third revised plan

28

invalid. *See* Ohio Constitution, Article XI, Section 9(B). We order that the commission be reconstituted and adopt a General Assembly–district plan that complies with the Ohio Constitution. *See id.* In their objections, however, petitioners ask this court to do more than simply invalidate the third revised plan and order the commission to adopt a new plan that complies with the Ohio Constitution. We deny petitioners' requests for additional or alternative relief submitted with their objections.

### 1. Adoption of an alternative plan

{¶ 64} The petitioners in *Bennett v. Ohio Redistricting Comm.* (Supreme Court case No. 2021-1198) and the petitioners in *Ohio Organizing Collaborative v. Ohio Redistricting Comm.* (Supreme Court case No. 2021-1210) ("*OOC* petitioners") ask this court to itself adopt a plan—either the independent map drawers' plan or Dr. Rodden's latest plan (referred to previously as "the Rodden III plan"). We decline to do so because we lack the constitutional authority to grant that relief. The Ohio Constitution expressly forbids this court from "order[ing], in any circumstance, the implementation or enforcement of any general assembly district plan that has not been approved by the commission in the manner prescribed by this article." Article XI, Section 9(D)(1); *see also* Article XI, Section 9(D)(2) ("No court shall order the commission to adopt a particular general assembly district plan or to draw a particular district").

{¶ 65} The *Bennett* petitioners acknowledge that Article XI, Section 9(D) prohibits the relief they are seeking, but they argue that "the facts have changed and now stand far beyond what Article XI contemplates." They argue that Section 9(D) "must bend in this moment." Yet they offer weak legal support for this assertion. Instead, they assert that it would be better for an Ohio court—as opposed to a federal court—to implement a plan and that doing so "will do the least violence to Ohio's constitutional structure." But we cannot disregard Section 9(D) simply to avoid the possibility that a federal court may take action under federal law. And as a matter of

comity, a federal court imposing a remedy under federal law would be mindful of the reality that we have declared that all four maps adopted by the commission violate the Ohio Constitution.

{¶ 66} The *OOC* petitioners take a slightly different approach: they argue that *this court* should enforce the federal Constitution by adopting a General Assembly–district plan. Put another way, they ask us to disregard the Ohio Constitution to vindicate the federal Constitution. But there is not a basis for this court to grant relief under the *OOC* petitioners' theory. For one thing, no petitioner has asserted a claim arising under the federal Constitution. And further, such a claim would conflict with the Ohio Constitution's conferred standing in original jurisdiction that appears in Article IV, Section 2(B)(1), which defines this court's original jurisdiction. Our original jurisdiction under Article XI, Section 9(A) of the Ohio Constitution applies only to cases arising *under Article XI*. *See* Ohio Constitution, Article XI, Section 9(A) ("The supreme court of Ohio shall have exclusive, original jurisdiction in all cases arising *under this article*" [emphasis added]). Finally, even if we were to entertain such a federal claim, the *OOC* petitioners have failed to sufficiently articulate the nature of the federal claim that might properly be before this court.

{¶ 67} The remedies suggested by the *Bennett* and *OOC* petitioners are based on their belief that a three-judge panel of the United States District Court for the Southern District of Ohio in *Gonidakis v. Ohio Redistricting Comm*, S.D.Ohio case No. 2:22-cv-0773, will order the implementation of a General Assembly plan by April 20, 2022. They are concerned that the federal court may implement a plan that we have already found unconstitutional, at least for the 2022 election cycle. According to the *Bennett* petitioners, questioning by the three-judge panel in *Gonidakis* during a March 30 preliminary-injunction hearing "made clear" that if the federal court does impose a plan, the options it is considering include the second revised plan that we declared invalid in *League III*, the third revised plan that we

declare invalid today, the district plan that was in place from 2011 to 2020, and other plans presented to that court.

{¶ 68} We are mindful of representations made by or on behalf of the secretary of state in the pending *Gonidakis* federal court proceedings that a district plan must be in place by April 20 for the last possible primary-election date for the 2022 election, August 2, to be feasible. However, we fail to see how this contention should motivate us—or the federal court for that matter—to adopt a plan for the 2022 state legislative elections by April 20. It is unclear as to why August 2, 2022, is the last available date for a primary election in Ohio.[9] We note that several states will have primary elections on August 16, 2022, or later, including four states that will have their primary elections in September. National Conference of State Legislatures, 2022 State Primary Election Dates and Filing Deadlines (Apr. 4, 2022), https://www.ncsl.org/research/elections-and-campaigns/2022-state-primary-election-dates-and-filing-deadlines.aspx (accessed Apr. 12, 2022) [https://perma.cc/Y73V-2TSB]. Thus, on the record before us, the so-called April 20 "deadline" for implementing a General Assembly–district plan appears to be an artificial deadline that is based on a speculative, potential primary-election date for state legislative races.

{¶ 69} While the commission has yet to adopt a constitutionally valid plan in time for the May 3 primary election,[10] sufficient time remains for the commission to perform its constitutional duty to adopt a valid General Assembly–district plan for use in the 2022 election cycle, including a primary election. Any suggestion that the federal court could—much less that it should—set an August 2 primary-election date as a remedy in the federal-court litigation strikes us as a dubious

---

9. August 2, 2022, is a date authorized for special elections, as provided in R.C. 3501.01(D).

10. The May 3 primary is proceeding for statewide, congressional, and local offices.

proposition at best. The authority for setting the date for a primary election belongs to the General Assembly, not to the Ohio Supreme Court, the secretary of state, or a federal court. *See* R.C. 3501.40 and 3501.01(E)(1). Principles of federalism and comity cut against a *federal* court ordering the date of a primary election for purely *state* offices due to a dispute over the validity of *state* legislative maps under the *state* constitution. Even when federal constitutional questions have been at issue in legislative-redistricting cases, the United States Supreme Court "has required federal judges to defer consideration of disputes involving redistricting where the State, through its legislative *or* judicial branch, has begun to address that highly political task itself." (Emphasis sic.) *Growe v. Emison*, 507 U.S. 25, 33, 113 S.Ct. 1075, 122 L.Ed.2d 388 (1993). In this case, the commission and this court have been addressing the task within the framework of Article XI of the Ohio Constitution.

{¶ 70} While the process has proved challenging for the commission, as evidenced by four legislative plans falling short of Article XI's requirements, the difficulty of the task is not a reason for federal-court intervention. In this case, there is a clear and viable path forward to having a constitutionally valid General Assembly–district plan in place for the 2022 election cycle. As set forth in detail below, the independent map drawers retained by the commission after *League III* started the commission down what could be a viable path of a General Assembly–district plan that complies with Article XI of the Ohio Constitution. Under these circumstances, we think it appropriate for the federal court to "stay[] its hand" in recognition of the principle that "[t]he power of the judiciary of a State to require valid reapportionment * * * has not only been recognized by [the United States Supreme] Court but appropriate action by the States in such cases has been specifically encouraged," *Scott v. Germano*, 381 U.S. 407, 409, 85 S.Ct. 1525, 14 L.Ed.2d 477 (1965).

{¶ 71} For these reasons, we decline to order the additional remedies that the *Bennett* and *OOC* petitioners request.

*2. Validation of an alternative plan*

{¶ 72} Senator Sykes and House Minority Leader Russo ask us to declare that the independent map drawers' plan is presumptively constitutional. There is also no constitutional basis for this court to grant that remedy. Article XI, Section 9(A) grants this court jurisdiction in cases arising under Article XI, and Section 9(B) contemplates that we may determine the constitutional validity of a "general assembly district plan *made by the Ohio redistricting commission*." (Emphasis added.) While the independent map drawers' plan may be the closest yet to meeting the Ohio Constitution's requirements, Article XI does not authorize this court to address the validity of a district plan in the absence of it being lawfully presented to this court for such a determination.

{¶ 73} We also note that by the admission of one of the plan's primary drafters, Dr. Johnson, that plan is not yet fully completed. According to Dr. Johnson, certain potential constitutional defects cannot be identified without running reports that he did not have time to complete before the commission's deadline for adopting the third revised plan.

**E. Possible approach for the commission**

{¶ 74} Though we do not have the power under Article XI to validate the independent map drawers' plan, we are also mindful of the secretary of state's position—taken in the federal-court litigation—that a General Assembly–district plan must be in place by April 20 for the last possible primary-election date for the 2022 election cycle, August 2, to be feasible. No matter what the primary date is to be, time is of the essence. With time in mind, it appears that the most efficient way for the commission to proceed may well be to continue working with Dr. McDonald and Dr. Johnson to complete the plan on which they have made considerable progress—if they are willing and available and if the commission has the authority

to timely retain them for additional work. By certain measures, their plan—though incomplete—is on track to being constitutionally compliant.

{¶ 75} The independent map drawers acknowledge that the process of finalizing their plan is incomplete. Although they have stated that they tried to comply with all provisions of the Constitution, no one has yet verified that their plan fully complies with Article XI, Sections 2, 3, 4, and 7. Nor have the independent map drawers had an opportunity to address or incorporate any of the commission's requests for amendments. With that caveat, there is evidence that the independent map drawers' plan—in its current form—outperforms the third revised plan on measures of partisan symmetry and on the distribution of competitive districts. For example, the independent map drawers' plan contains three House districts with a Democratic vote share between 50 and 52 percent and three House districts with a Republican vote share between 50 and 52 percent—an equal number—whereas the third revised plan contains 17 such Democratic House districts but zero such Republican House districts. Regarding the Senate, the independent map drawers' plan has two Democratic seats in that competitive range whereas the third revised plan has six such seats. Neither plan has any Republican Senate seats in that range.

{¶ 76} Moreover, Dr. Rodden's analysis indicates that the independent map drawers' plan outperforms the third revised plan on a number of other metrics: the plan achieves partisan proportionality that closely corresponds to statewide voter preferences, splits fewer voting precincts, and is more compact as a whole. Dr. Rodden's analysis also cuts against a consistent theme of respondents throughout this litigation—that the commission's prior maps were necessitated by Ohio's political geography. Dr. Rodden explained that the independent map drawers' plan helps to confirm that this was not the case. In other words, the plan on which Dr. McDonald and Dr. Johnson performed considerable work appears on track to achieve what respondents have consistently argued is impossible due to Ohio's political

"geography" by which Republican and Democratic voters are distributed throughout the state.

{¶ 77} Regardless of the availability of Dr. McDonald and Dr. Johnson to complete their work on the plan they were preparing, the commission should continue the course it began when it followed our and the attorney general's recommendations to engage independent map drawers. Even if the commission is unable to engage Dr. McDonald and Dr. Johnson, the commission has a head start toward a complete and possibly constitutionally compliant plan. Dr. McDonald and Dr. Johnson produced an almost completed set of General Assembly–district maps for which the commission agreed to pay them nearly $100,000. To completely abandon that work seems like a waste of resources and taxpayer dollars and could take us further away from the constitutionally required goal of a fair district plan. Just as in *League III*, when we recommended that the commission take certain steps to ensure a constitutional process, we now likewise express the view that the commission should use the independent map drawers' work thus far as a starting point for the next plan.

## IV. CONCLUSION

{¶ 78} We sustain petitioners' objections to the third revised plan under Article XI, Sections 6(A) and 6(B) of the Ohio Constitution and invalidate the third revised plan in its entirety. We further order the commission to be reconstituted, to convene, and to draft and adopt an entirely new General Assembly–district plan that meets the requirements of the Ohio Constitution, including Article XI, Sections 6(A) and 6(B) as we have explained those provisions in each of our four decisions in these cases. As we suggested in *League III*, to promote transparency and increase public trust, the drafting of the plan is best accomplished in public view with frequent meetings to demonstrate the commission's bipartisan efforts to reach a constitutional plan. *See* __ Ohio St.3d __, 2022-Ohio-789, __ N.E.3d __, at ¶ 44.

{¶ 79} We further order the commission to file the district plan with the secretary of state by 9:00 a.m. on May 6, 2022, and to file it with this court by noon on the same date. We retain jurisdiction for the purpose of reviewing the new plan.

{¶ 80} Petitioners shall file objections, if any, to the new plan by 9:00 a.m., three days after the new plan is filed in this court. Respondents shall file responses by 9:00 a.m., three days after the objections are filed. If the deadline for objections or responses falls on a Saturday, Sunday, or holiday, then the objections or responses shall be filed by 9:00 a.m. on the next business day. Petitioners shall not file a reply or any motion for leave to file a reply. The clerk of the court shall refuse to accept any filings under this paragraph that are untimely or prohibited.

{¶ 81} No requests or stipulations for extension of time for the objections or responses shall be filed, and the clerk shall refuse to file any requests or stipulations for extension of time. For good cause shown, the commission may file a motion for extension of time to file the district plan with the secretary of state. And for the reasons explained above, we deny petitioners' requests for additional relief.

Objections sustained

and alternative or additional relief denied.

O'CONNOR, C.J., and STEWART and BRUNNER, JJ., concur.

DONNELLY, J., concurs, with an opinion.

KENNEDY, J., dissents, with an opinion.

FISCHER, J., dissents, with an opinion and joins paragraphs 151-152 and 157-158 of Justice DeWine's dissenting opinion.

DEWINE, J., dissents, with an opinion joined by KENNEDY, J.

_____

**DONNELLY, J., concurring.**

{¶ 82} I join the majority opinion in full. I write separately only to make some additional observations.

{¶ 83} In *League of Women Voters of Ohio v. Ohio Redistricting Comm.*, __ Ohio St.3d __, 2022-Ohio-789, __ N.E.3d __, ¶ 30, we suggested that "[t]he [Ohio Redistricting Commission] should retain an independent map drawer—who answers to all commission members, not only to the Republican legislative leaders—to draft a plan through a transparent process." The commission commendably seemed to heed our suggestion by retaining *two* independent map drawers, at public expense, whose map drawing was viewable by livestream to promote transparency and increase public trust in the redistricting process.

{¶ 84} But just when the independent map drawers were perilously close to showing that the difficult was achievable by drawing a General Assembly–district plan that satisfied the proportionality requirements of Article XI, Section 6(B) of the Ohio Constitution without partisan asymmetry that violated Article XI, Section 6(A), the commission's majority-party members summarily pulled the plug on that process. Discarding the independent map drawers' work product, and to the shock of many, commission member and respondent President of the Senate Matt Huffman revealed a plan that had been prepared by majority-party staffers within days of the deadline that cosmetically tweaked the invalidated second revised plan. He then laid the third revised plan before the commission less than two hours before the expiration of its deadline for adopting a new plan.

{¶ 85} The independent map drawers' efforts were apparently little more than a sideshow—yet more fodder in this political sport. In 2018, commission member and respondent Secretary of State Frank LaRose, who was then a state senator, co-authored an article calling for substantive changes to the way that state- and federal-legislative districts are drawn. He was correct when he acknowledged at that time that "[a]lthough both parties have been guilty of unfairly reconfiguring districts to their benefit, Republicans have taken the heat in recent years for prominent gerrymandering cases." LaRose & Olsen, *The Supreme Court didn't act on gerrymandering, so it's up to state legislators to stop doing it*, NBC News (June

18, 2018), https://www.nbcnews.com/think/opinion/supreme-court-didn-t-act-gerrymandering-so-it-s-state-ncna884501 [https://perma.cc/M7U7-2NUP].[11] He further stated, "Take it from us two Republican state legislators: Even if our party benefitted, it's still wrong. By gerrymandering districts, we send the message that winning elections is more important than finding effective policy solutions for all citizens. And when that happens, we lose the trust and confidence of the people we were elected to represent." *Id.* And he concluded the article by stating, "It's time to end gerrymandering—which protects party politics at the expense of the American people—and allow true democracy to flourish." *Id.*

{¶ 86} Yet, since the adoption of the constitutional reforms mandated by Article XI, these cases have regrettably confirmed that relatively little has changed in how legislative-district plans are drawn. The design of legislative districts remains firmly in the grip of the majority party's legislative politicians to the exclusion of all others. The Ohio Redistricting Commission is independent in theory only. Indeed, the commission's plans in these cases have consistently been drafted by the majority party's political staffers to the exclusion of the minority party and at times even to the virtual exclusion of the majority-party commission members in order to maintain dominance by the majority party. The revised plans were based largely on plans that we previously declared invalid and were withheld until the majority party's then-newest plan was revealed and perfunctorily adopted at the 11th hour with no time for review or discussion. Yet Secretary of State LaRose's current stance is not to reexamine the flawed process used to generate district plans but to remain open to the prospect of impeaching a judicial officer who dared to have the temerity to support and defend the constitutional reforms

---

11. Indeed, as we said in *Adams v. DeWine*, __ Ohio St.3d __, 2022-Ohio-89, __ N.E.3d __, ¶ 2, partisan gerrymandering, "by whichever political party has control to draw geographic boundaries for elected state and congressional offices" to strategically exaggerate the power of the majority party's voters while diminishing the power of the minority party's voters, perverts representative democracy.

that Ohioans—like LaRose when he was a state senator—celebrated over partisan tribal politics that value political power over all else. *See* Schladen, *LaRose would "be fine with" chief justice's impeachment over redistricting rulings* (Apr. 1, 2022), https://ohiocapitaljournal.com/2022/04/01/larose-would-be-fine-with-chief-justices-impeachment-over-redistricting-rulings/ [https://perma.cc/YXC8-JBLY]**.**

**{¶ 87}** What appeared to be the start of a transparent redistricting process when the two independent map drawers were engaged by the commission became transparent only in the sense that it exposed the falsehood that some of the commission members had fulfilled their obligations under the Ohio Constitution. As to that, Ohioans are still watching and waiting.

———————————

**KENNEDY, J., dissenting.**

**{¶ 88}** The measure of power is its limits. Respecting the limits of power is essential to our American form of government. Anything less is an affront to it.

**{¶ 89}** The essential characteristic of our government—the separation of powers—is part of the woven fabric of the Ohio Constitution. *See S. Euclid v. Jemison*, 28 Ohio St.3d 157, 158-159, 503 N.E.2d 136 (1986). At their core, the issues in these cases concern that basic concept.

**{¶ 90}** In yet another wiping-egg-from-its-face moment, the majority retreats from its edicts in *League of Women Voters of Ohio v. Ohio Redistricting Comm.*, __ Ohio St.3d __, 2022-Ohio-789, __ N.E.3d __ ("*League III*"), to explain that when it set out the steps the commission "should" take, it did not mean that the commission *must* take those steps, and it now admits to petitioners in these cases that this court does not have the power to tell the commission how to perform its constitutional duties. All the majority can do is "suggest" steps the commission could take. I agree that the Ohio Constitution does not give this court the power to tell respondent Ohio Redistricting Commission, an independent constitutional body, whom to hire, how to do its work, or who should draw a redistricting plan.

Article XI, Section 9(B) of the Ohio Constitution merely provides that if a map is invalidated, the redistricting commission is reconstituted pursuant to Article XI, Section 1. And nothing in Section 9(B) or Section 1 gives this court power to control the work of the commission.

{¶ 91} By recognizing this limitation, the majority takes one step forward but two steps back, because it continues to ignore the limitations of its power by redefining its power under Section 9. The plain, limiting language of Section 9(D)(3) provides that this court cannot invalidate a plan without a predicate violation of the objective map-drawing requirements of Sections 2, 3, 4, 5, or 7. By adhering to its view of unlimited power, the majority keeps bringing us back to September 2021—the time when these redistricting cases were first filed; we are stuck in a time loop, like the characters in the movie *Groundhog Day*. The movie, of course, was comedic entertainment, but the outcome of these cases is anything but that for the people of this state. The majority's continued denial of the limitation of this court's power may end up costing the taxpayers millions of dollars—money that is being consumed by the never-ending cycle of map drawing, litigation, and now, two primaries, one on May 3 and the other perhaps on August 2, all ordained by the majority's overreach. The state is still without functional House and Senate districts, and its voters have no idea when a primary will take place for General Assembly offices.

{¶ 92} Because the Ohio Constitution does not give this court the power to tell the commission how it "should" exercise its power and perform its work, I agree with the majority that this court cannot hold it in contempt. I disagree, however, with the majority's determination that this court may continue to exercise judicial power over these redistricting cases pursuant to Article XI, Sections 6(A) and 6(B), and I dissent from its judgment invalidating yet another plan.

**The Commission Cannot Be Held in Contempt**

{¶ 93} The majority tries to walk back the imperative language it used in its March 16 decision, which stated that the commission "should" hire an independent map-drawing expert, convene frequent meetings to draw the maps in public, and adopt a plan prepared by the commission as a whole. *League III*, __ Ohio St.3d __, 2022-Ohio-789, __ N.E.3d __ at ¶ 30, 44. It now frames these directives as mere suggestions or recommendations, even though the word "should" expresses a duty or obligation, *Webster's Third New International Dictionary* 2104 (2002). The majority also attempts to shift responsibility for its overreach onto Ohio Attorney General Dave Yost, noting that he suggested treating the court's directions "with the degree of deference one might pay to the suggestions of one's spouse."

{¶ 94} But regardless of how the majority characterizes its prior opinion, this court does not have the power to hold the commission or its members in contempt. This court recently explained in *Toledo v. State*, 154 Ohio St.3d 41, 2018-Ohio-2358, 110 N.E.3d 1257, that " '[t]he power of contempt is inherent in a court, such power being necessary to the exercise of judicial functions.' " *Id*. at ¶ 22, quoting *Denovchek v. Trumbull Cty. Bd. of Commrs.*, 36 Ohio St.3d 14, 15, 520 N.E.2d 1362 (1988). The primary interest at stake in a contempt proceeding is the court's " 'authority and proper functioning,' " *id*., quoting *Denovchek* at 16, so a litigant may be held in contempt of court for conduct that " ' "brings the administration of justice into disrespect, or which tends to embarrass, impede or obstruct a court in the performance of its functions," ' " *id.*, quoting *Denovchek* at 15, quoting *Windham Bank v. Tomaszczyk*, 27 Ohio St.2d 55, 271 N.E.2d 815 (1971), paragraph one of the syllabus.

{¶ 95} Our decision in *Toledo* continued, stating that " '[i]f a valid restrictive order has been issued, a court has the statutory and inherent power to entertain contempt proceedings and punish disobedience of that order.' " *Id.* at ¶ 23, quoting *Planned Parenthood Assn. of Cincinnati, Inc. v. Project Jericho*, 52

Ohio St.3d 56, 61, 556 N.E.2d 157 (1990). "But a court order cannot be enforced in contempt unless the order was 'clear and definite, unambiguous, and not subject to dual interpretations.' " *Id.*, quoting *State ex rel. Cincinnati Enquirer v. Hunter*, 138 Ohio St.3d 51, 2013-Ohio-5614, 3 N.E.3d 179, at ¶ 25.

{¶ 96} This court had no authority to tell the commission whom to hire or how to do its work; therefore, it follows that the court cannot hold the commission in contempt. Redistricting is a legislative process, *Wilson v. Kasich*, 134 Ohio St.3d 221, 2012-Ohio-5367, 981 N.E.2d 814, ¶ 20, and "the great heritage of the common law and the principles of free government" provide the basis for legislative immunity and, by extension, immunity to others when exercising a legislative function, *Bigelow v. Brumley*, 138 Ohio St. 574, 582, 37 N.E.2d 584 (1941). Article XI gives the responsibility for drafting and adopting a General Assembly–district plan to the Ohio Redistricting Commission, an independent constitutional body, so its members are not subject to personal liability or personal incarceration as punishment for contempt for actions taken while engaged in the legislative process of redistricting, *see id.* at 583-584. As we explained in *Hicksville v. Blakeslee*, "[t]hat legislative officers are not liable personally for their legislative acts is so elementary, so fundamentally sound, and has been so universally accepted, that but few cases can be found where the doctrine has been questioned and judicially declared." 103 Ohio St. 508, 517, 134 N.E. 445 (1921).

{¶ 97} Adherence to the defined roles of each branch is essential to the functioning of our representative democracy. Therefore, maintaining respect for the enumerated powers granted expressly to the commission precludes this court from interfering with the exercise of those powers or attempting to supervise the commission's work through the threat of contempt. In *DeRolph v. State*, the court's reasoning that "it is not the function of the judiciary to supervise or participate in the legislative and executive process" applies equally to the commission, an independent constitutional body exercising the legislative power. 78 Ohio St.3d

419, 420, 678 N.E.2d 886 (1997). It is therefore only after the commission has completed its work and adopted a General Assembly–district plan that this court has any power to review it. *See Toledo* at ¶ 29. Even then, the court may not invalidate the plan unless it is inconsistent with the Constitution. *See id.* "The separation-of-powers doctrine * * * precludes the judiciary from asserting control over 'the performance of duties that are purely legislative in character and over which such legislative bodies have exclusive control.' " *Toledo*, 154 Ohio St.3d 41, 2018-Ohio-2358, 110 N.E.3d 1257, at ¶ 27, quoting *State ex rel. Grendell v. Davidson*, 86 Ohio St.3d 629, 633, 716 N.E.2d 704 (1999).

{¶ 98} For these reasons, the commission cannot be held in contempt for submitting a redistricting plan that did not come from the independent map drawers, because this court had no power to order the commission to hire the independent map drawers and to yield its constitutional power to them.

### A Standalone Violation of Section 6 Is Not Actionable

{¶ 99} Seemingly, the majority eschews the limitations on this court's power established in Article XI, Section 9, because since the beginning of these cases, the majority has construed Article XI broadly as granting this court the power to invalidate a General Assembly plan *for any reason*.

{¶ 100} No one disputes that this court's authority to review a General Assembly–district plan comes from Section 9. However, Section 9(A) says only that this court has subject-matter jurisdiction over all cases arising under Article XI, and Section 9(B) does not contain any additional grant of power. And contrary to its declaration in *League I* that it may invalidate a district plan for any reason, the majority now recognizes that the court's power of review is not unlimited, because Sections 9(D)(1) and (D)(2) "expressly forbid," majority opinion at ¶ 64, this court from adopting the plans drawn by the commission's independent map drawers or by experts who have prepared alternative plans.

{¶ 101} Under Article XI, Section 9(D)(3), "[i]f the supreme court of Ohio determines that a general assembly district plan adopted by the commission does not comply with the requirements of Section 2, 3, 4, 5, or 7 of this article," it may invalidate a district plan in whole or in part, depending on the violation. And because Article XI, Section 9(D) limits the available remedies to a plan that fails to comply with Article XI, Sections 2, 3, 4, 5, or 7, petitioners' claims asserted in this litigation—that the plans adopted by the commission violate Sections 6(A) and 6(B)—have failed to state a claim for relief. This court has no power to invalidate a plan simply because it violates Section 6.

**Alternative Remedies**

{¶ 102} Petitioners ask this court to adopt the incomplete redistricting plan drawn by the commission's independent map drawers. However, this plan has not yet been judged in the crucible of cross-examination, and the majority admits that "no one has yet verified that their plan fully complies with Article XI, Sections 2, 3, 4, and 7," majority opinion at ¶ 75. The majority dismisses respondents Senate President Matthew Huffman and Speaker of the House Robert Cupp's concern that the independent map drawers achieved a more proportional division by slicing heavily Democratic urban areas and joining (or "spoking") those slices with Republican-leaning areas in rural or suburban areas. The majority then contends that there is "no evidence" that this method of drawing districts results in less compact districts. *Id.* at ¶ __. However, Dr. Michael Barber, an associate professor of political science at Brigham Young University, explained early on in this litigation that this method of drawing districts "requires intentional gerrymandering and violates Article XI's neutral map-making requirements" by dividing more government units than allowed by Article XI, Section 3(D)(3). *League of Women Voters of Ohio v. Ohio Redistricting Comm.*, ___ Ohio St.3d ___, 2022-Ohio-342, ___ N.E.3d ___ ("*League II*"), ¶ 124-127 (Kennedy and DeWine, JJ., dissenting). Sections 6(A) and 6(B) provide that the commission must attempt to adopt a plan

that neither favors nor disfavors a political party and that corresponds closely to the statewide preferences of Ohio voters. However, as Dr. Barber's report explains, Ohio's political geography makes that practically impossible.

### How Did We Get Here?

{¶ 103} This is the fourth time that petitioners have challenged the validity of a General Assembly–district plan adopted by the commission, and a majority of this court has invalidated each plan for not complying with Article XI, Sections 6(A) and 6(B) of the Ohio Constitution. *See League of Women Voters of Ohio v. Ohio Redistricting Comm.*, ___ Ohio St.3d ___, 2022-Ohio-65, ___ N.E.3d ___, ¶ 2 ("*League I*"); *League II* at ¶ 68; *League III*, ___ Ohio St.3d ___, 2022-Ohio-789, ___ N.E.3d ___, at ¶ 2.

{¶ 104} This history is summarized in the following charts:

| *League I*, ___ Ohio St.3d ___, 2022-Ohio-65, ___ N.E.3d ___<br>January 12, 2022 | | | |
|---|---|---|---|
| Commission's Redistricting Plan | **Petitioners' Challenges** | **Majority's Holding** | **Majority's Order** |
| Plan favors Republicans:<br>• House: 62-to-37 margin<br>• Senate: 23-to-10 margin | • Court may invalidate a plan for stand-alone violations of Section 6<br>• Plan violates Section 6(B) because proportional political leaning of the districts within the plan does not correspond closely to the statewide preferences of Ohio voters<br>• Plan violates Section 6(A) because it was drawn primarily to favor the majority party of the General Assembly and disfavor the minority party | • Commission did not "attempt" to comply with Section 6(A) or 6(B)<br>• The statewide preference of Ohio voters over the prior ten years was such that 54 percent of Ohio voters voted in favor of Republican candidates and 46 percent in favor of Democratic candidates, and the plan did not closely correspond with those preferences<br>• Plan violates Section 6(B) because the commission had not shown that a more proportionate plan was not possible<br>• Plan violates Section 6(A) because the commission as a whole had not drafted the plan, it had not hired independent map drawers, and one party had controlled the map-drawing software | • Reconstitute commission to adopt a plan in conformity with the Ohio Constitution within ten days<br>• Court retains jurisdiction to review the plan for compliance with the majority's order |

*League II*, __ Ohio St.3d __, 2022-Ohio-342, __ N.E.3d __
February 7, 2022

| Commission's Redistricting Plan | Petitioners' Challenges | Majority's Holding | Majority's Order |
|---|---|---|---|
| Plan favors Republicans:<br>• House: 57-to-42 margin<br>• Senate: 20-to-13 margin | • Revised plan violates Sections 6(A) and 6(B)<br>• Commission violated Section 6(A) by drawing nominally Democratic-leaning districts<br>• The process the commission followed created the appearance of partisanship: (1) the commission did not draw the maps as a body; instead, the maps were drawn by the same Republican staffers; and (2) the commission failed to hold public hearings<br>• Commission violated Section 6(B) because the number of toss-up districts favors Republicans | • To closely correspond with the statewide preferences of Ohio voters under Section 6(B), a plan must match a 54-46 ratio, which is a "foundational ratio created not by this court or by any particular political party but instead etched by the voters of Ohio into our Constitution," *League II* at ¶ 64<br>• Plan violates Section 6(B) because it achieved proportionality by drawing all close seats in Democratic-leaning areas and not in Republican-leaning ones, resulting in partisan asymmetry<br>• Districts with 51 percent or less Democratic lean are not districts that favor Democrats<br>• Plan violates Section 6(A) because the drawing process showed the intent to favor the Republican party: (1) the commission did not redraw the map from scratch, (2) the commission failed to hold frequent public meetings, and (3) the plan was drafted by partisan staffers | • Court orders the commission to draft a new map from scratch<br>• Toss-up districts must be excluded from the proportionality assessment or allocated to each party in close proportionality to its statewide vote share<br>• Commission must adopt a plan by February 17, 2022<br>• Clerk of this court to "refuse to file any requests or stipulations for extension of time" |

*League III*, __ Ohio St.3d __, 2022-Ohio-789, __ N.E.3d __
March 16, 2022

| Commission's Redistricting Plan | Petitioners' Challenges | Majority's Holding | Majority's Order |
|---|---|---|---|
| Plan favors Republicans:<br>• House: 54-to-45 margin<br>• Senate: 18-to-15 margin | Commission failed to adopt a new plan by February 17, 2022, and petitioners request that it be ordered to show cause why it should not be held in contempt.<br><br>After the commission filed its plan, the chief justice continues the hearing on the show-cause order.<br><br>Petitioners argue that the third revised plan violates Section 6(A) because<br>• 19 Democratic-leaning House districts favor Democrats by two points or less<br>• plan was drafted in private by Republican staffers<br><br>Petitioners contend that the plan violates Section 6(B) because the 26 competitive Democratic-leaning districts could be won by Republicans if the election favored them by two points. | • Plan violates Section 6(A) because the commission did not follow the process that Article XI requires<br>• Commission did not draft the plan; instead, the plan was drawn by Republican staffers<br>• Majority-party members of the commission excluded the minority-party members from participating in the plan's creation<br>• Districts with a sub-52-percent Democratic lean allocated to the Democratic Party under the second revised plan are "competitive" districts and, under the court's holding in *League II*, must be excluded when assessing the plan's overall proportionality<br><br>. | • Commission *should* retain an independent map drawer answerable to all commission members<br>• Drafting *should* occur in public<br>• Commission *should* convene frequent meetings<br>• Plan must be filed by March 28<br>• Clerk of this court "shall refuse to file any requests or stipulations for extension of time," *League III* at ¶ 47 |

*League of Women Voters of Ohio v. Ohio Redistricting Comm.*, __ Ohio St.3d __ 2022-Ohio-__, __ N.E.3d __
April 14, 2022

| Commission's Redistricting Plan | Petitioners' Challenges | Majority's Holding | Majority's Order |
|---|---|---|---|
| Plan favors Republicans:<br>• House: 54-to-45 margin<br>• Senate: 18-to-15 margin<br>• Number of sub-52-percent Democratic-leaning districts reduced by two in House and by one in Senate | Petitioners renew their motions to hold the commission in contempt and object to the third revised plan:<br>• Plan fails to comply with the court's order to hire an independent map drawer, to draw the map in public as the commission, and to draw a proportional map without seeking to favor a party<br>• Plan violates Section 6(A) for the same reasons plan in *League III* did<br>• Plan also violates Section 6(B), because all competitive seats have been drawn to lean Democratic | • Plan violates Section 6(A) because it was not drafted and adopted by the commission but, rather, modified the prior invalid plan; the plan remains disproportional because all districts labeled as competitive lean Democratic<br>• There remains an aggregate asymmetry in the assignment of toss-up districts, demonstrating partisan bias under Section 6(A)<br>• Too many districts that were counted as Democratic districts are instead tossups, and that lack of proportionality violates Section 6(B) | • Adopt a new plan by May 6<br>• Suggests drafting best accomplished in frequent public meetings to promote transparency and increase public trust<br>• Recommends that commission use the independent map makers' work from latest attempt as starting point<br>• Court retains jurisdiction<br>• "For good cause shown, the commission may file a motion for extension of time to file the district plan with the secretary of state," majority opinion, ¶ 81 |

**{¶ 105}** These charts show how we have gotten to this point, but this flow chart shows how the Constitution envisioned the redistricting process:



{¶ 106} We are far afield from this roadmap, and Ohio is now stuck in a proverbial "time loop" because the Constitution does not contemplate the outsized role in redistricting that the majority has assumed for itself. Article XI includes an impasse procedure that governs when the partisan officeholders who make up the commission are at a stalemate. The result is a map that stays in place for four years. The Constitution did not anticipate the majority's claim to power under Article XI, Section 9, and therefore, no procedure applies when a majority of this court and the commission are at loggerheads. Instead, the process endlessly repeats itself. That is where we are.

## Conclusion

{¶ 107} The complaints in these cases allege that the General Assembly–district plan adopted by the commission is unconstitutional, because the commission failed to comply with Article XI, Sections 6(A) and 6(B) of the Ohio Constitution. The majority continues relying on its overreach of power to invalidate the plan based solely on a stand-alone violation of Section 6(A) or 6(B). Now, after months have passed and thousands of taxpayer dollars have been spent, we are right back to where we were on September 21, 2021, without any end in sight. With two separate primaries looming, the taxpayers are looking at spending millions more. Had we adhered to this court's power to invalidate a district plan only if it violates Sections 2, 3, 4, 5, or 7, the complaints would have been dismissed and the people of Ohio would have been able to vote in all races on May 3, 2022.

––––––––––––––––––

**FISCHER, J., dissenting.**

{¶ 108} I respectfully dissent from the majority opinion's decision to sustain petitioners' objections to the latest General Assembly–district plan.

## I. The majority opinion's approach creates problems by running afoul of the Ohio Constitution

{¶ 109} As noted in my previous separate opinions, all three complaints in these cases allege that this matter is governed by the impasse procedures set forth in Article XI, Section 8 of the Ohio Constitution. *See League of Women Voters of Ohio v. Ohio Redistricting Comm.*, ___ Ohio St.3d ___, 2022-Ohio-65, ___ N.E.3d ___, ¶ 280 ("*League I*") (Fischer, J., dissenting); *League of Women Voters of Ohio v. Ohio Redistricting Comm.*, ___ Ohio St.3d ___, 2022-Ohio-342, ___ N.E.3d ___, ¶ 152 ("*League II*") (Fischer, J., dissenting); *League of Women Voters of Ohio v. Ohio Redistricting Comm.*, ___ Ohio St.3d ___, 2022-Ohio-789, ___ N.E.3d ___, ¶ 195 ("*League III*") (Fischer, J., dissenting). This court can neither ignore nor change those allegations, and these are the same allegations that form the basis of the challenges to the current plan in these cases. But, yet again, the majority opinion does not take those uncontradicted allegations into account—all to the detriment of Ohio and its citizens.

{¶ 110} Accordingly, once again, the majority opinion fails to follow the words of the Ohio Constitution. *See League III* at ¶ 151 (Fischer, J., dissenting). In doing so, as more fully explained below, the majority opinion undermines, undercuts, and guts the entire structure of Article XI. *See League II* at ¶ 151 (Fischer, J., dissenting). And it is this subversion of the wording of Article XI that is the reason the majority opinion today continues to create more and more problems for Ohio.

{¶ 111} By eliminating the "stick" of a possible four-year plan, as specified in the Ohio Constitution in Article XI, Section 8(C)(1)(a), while maintaining only the "carrot" of a ten-year plan, today's majority opinion tells, as it effectively has repeatedly told, the minority-party members of respondent Ohio Redistricting Commission to never agree, i.e., never, ever reach a compromise with the majority-party members, because if the minority party does not get *everything* that it desires,

then the minority group can just go back to court again and again and again until the minority party gets exactly what it desires. And that is exactly what is happening here.

{¶ 112} Without the continuing "threat" of the four-year plan as a "stick" to prod compromise, the majority opinion destroys Article XI's very foundation and makes it mere dust. And the essence of that "dust" is then the "whims" or current "feelings" of what a plan should be in the mind of a majority of this court. The Ohio Constitution, and Article XI in particular, do not support this type of decision.

{¶ 113} Thus, we have yet another majority opinion declaring a plan of the commission unconstitutional—as there is no reason for any minority-party member of the commission to come to a compromise with the majority-party members of the commission, contrary to what Article XI, Section 8 of the Ohio Constitution specified when it was approved by more than 70 percent of Ohio voters in 2015. *See League I*, ___ Ohio St.3d ___, 2022-Ohio-65, ___ N.E.3d ___, at ¶ 313 (Fischer, J., dissenting), citing Ohio Secretary of State, Statewide Issue History, https://www.ohiosos.gov/elections/election-results-and-data/historical-election-comparisons/statewide-issue-history/ (accessed Jan. 2, 2022) [https://perma.cc/CK6W-2KUC]. If the majority opinions in these cases had not undercut the Ohio Constitution by ignoring the constitutional text of Section 8, as explained again below and in my prior separate opinions in these cases, then the state of Ohio would have had a four-year General Assembly–district plan months ago, no problems setting election dates, no threat of a federal court taking over the drawing of Ohio's House and Senate district lines, no extraconstitutional orders in majority opinions in these cases, no motions for show-cause orders, and certainly no continuing constitutional crisis.

{¶ 114} One might argue that I overreached when using the word "generations" in my first dissent in these cases, *League I* at ¶ 351 (Fischer, J.,

dissenting) ("[t]he resulting lack of the citizens' support will harm the judicial branch of Ohio's government for generations"), and that perhaps I should have used the phrase "for many years to come" instead. Nevertheless, my prediction of problems to come to Ohio because of the majority opinions disregarding the text of Article XI, Section 8, unfortunately has come true, although I wish I had been wrong. But the list of problems set forth in the paragraph above is directly—and undeniably—caused by the majority opinions not following the wording of the Constitution.

## II. The structure of Article XI, Section 8

{¶ 115} As I have said before, *see id.* at ¶ 282-286 (Fischer, J., dissenting); *League II*, ___ Ohio St.3d ___, 2022-Ohio-342, ___ N.E.3d ___, at ¶ 152 (Fischer, J., dissenting), Article XI, Section 8(C)(1)(a) specifies that a four-year plan—and all the adopted plans have been four-year plans—is in effect for two election cycles (four years), without exception, unlike the six-year plan in the same part of Article XI and the ten-year plan in Article XI, Section 8(B):

> (B) If the commission adopts a final general assembly district plan in accordance with division (A)(3) of this section by the vote required to adopt a plan under division (B)(3) of Section 1 of this article, the plan shall take effect upon filing with the secretary of state and shall remain effective until the next year ending in the numeral one, *except as provided in Section 9 of this article*.

> (C)(1)(a) Except as otherwise provided in division (C)(1)(b) of this section, if the commission adopts a final general assembly district plan in accordance with division (A)(3) of this section by a simple majority vote of the commission, and not by the vote required to adopt a plan under division (B)(3) of Section 1 of this article, the plan shall take effect upon filing with the secretary of state and shall

remain effective until two general elections for the house of representatives have occurred under the plan.

(b) If the commission adopts a final general assembly district plan in accordance with division (A)(3) of this section by a simple majority vote of the commission, and not by the vote required to adopt a plan under division (B) of Section 1 of this article, and that plan is adopted to replace a plan that ceased to be effective under division (C)(1)(a) of this section before a year ending in the numeral one, the plan adopted under this division shall take effect upon filing with the secretary of state and shall remain effective until a year ending in the numeral one, *except as provided in Section 9 of this article*.

(Emphasis added.)  I emphasize, once again, *see League I* at ¶ 286 (Fischer, J., dissenting); *League II* at ¶ 152 (Fischer, J., dissenting), that Section 8(C)(1)(a) contains no exception providing that the effectiveness of a four-year plan is subject to Article XI, Section 9.

### III.  The majority opinion continues to head in the wrong direction

{¶ 116} As a further "bad consequence" of ignoring this wording, the majority opinions have either wrongfully ordered or improperly "advised" the Ohio Redistricting Commission to take particular actions, and this court has no authority to do either of those things.  *See League III*, ___ Ohio St.3d ___, 2022-Ohio-789, ___ N.E.3d ___, at ¶ 30 ("[t]he commission *should* retain an independent map drawer" [emphasis added]); *id.* at ¶ 44 ("the drafting *should* occur in public and the commissioners *should* convene frequent meetings to demonstrate their bipartisan efforts to reach a constitutional plan within the time set by this court" [emphasis added]).

**{¶ 117}** If this "should" language of the *League III* majority opinion stating that the commission should/must follow certain procedures in drafting a plan constituted an order of this court, then it was an order of dubious enforceability, as the Ohio Supreme Court has no authority under the Ohio Constitution to demand another state constitutional entity, especially one acting in a legislative capacity, to do anything. *See State ex rel. State v. Lewis*, 99 Ohio St.3d 97, 2003-Ohio-2476, 789 N.E.2d 195, ¶ 34, quoting *DeRolph v. State*, 78 Ohio St.3d 419, 422, 678 N.E.2d 886 (1997) (Moyer, C.J., concurring in part and dissenting in part) (" 'Typically, when a Supreme Court declares a legislative act to be unconstitutional it does not order the legislative body to enact new legislation. Nor does it remand the case to a trial court with an order to retain jurisdiction over the consequent act of the legislative authority, including jurisdiction to rule upon the constitutionality of the new legislation' "); *Toledo v. State*, 154 Ohio St.3d 41, 2018-Ohio-2358, 110 N.E.3d 1257, ¶ 2 (a court cannot order the legislature not to enact specific legislation, as the legislature has exclusive authority over duties that are purely legislative in nature).

**{¶ 118}** And if the majority opinions' wordings were merely "recommendations" or "advisory," in any way, then the majority opinions—like today's version—constitute unconstitutional advisory opinions, in absolute disregard of longstanding and repeated caselaw of this court. *See, e.g.*, *State ex rel. White v. Kilbane Koch*, 96 Ohio St.3d 395, 2002-Ohio-4848, 775 N.E.3d 508, ¶ 18 ("Our conclusion comports with our well-settled precedent that we will not indulge in advisory opinions"), citing *State ex rel. Baldzicki v. Cuyahoga Cty. Bd. of Elections*, 90 Ohio St.3d 238, 242, 736 N.E.2d 893 (2000); *Egan v. Natl. Distillers & Chem. Corp.*, 25 Ohio St.3d 176, 495 N.E.2d 904 (1986), syllabus ("it is well-settled that this court will not indulge in advisory opinions"). And as today's majority opinion, *id.* at ¶ 39, and concurring opinion, *id.* at ¶ 83 (Donnelly, J., concurring), indicate, if the "should" language was advisory and/or merely

suggestive, then this court must later consider whether petitioners' motions for show-cause orders/contempt violate Civ.R. 11. Members of this court have had to spend substantial time reviewing those baseless and unnecessary motions.

{¶ 119} Either extraconstitutional action from these majority opinions is the result—and an outward and obvious sign or symbol—of this court far exceeding its role in Ohio's government, violating the separation of powers inherent in the Ohio Constitution, *see Cleveland Bar Assn. v. Picklo*, 96 Ohio St.3d 195, 2002-Ohio-3995, 772 N.E.2d 1187, ¶ 4, quoting *S. Euclid v. Jemison*, 28 Ohio St.3d 157, 158-159, 503 N.E.2d 136 (1986), citing *State v. Warner*, 55 Ohio St.3d 31, 43-44, 564 N.E.2d 18 (1990); *State ex rel. Atty. Gen. v. Harmon*, 31 Ohio St. 250 (1877), and thus undermining the rule of law in this state—a mistaken and problematic role for this court, which must always act to support the rule of law.

{¶ 120} This latest majority opinion takes the extraconstitutional/unconstitutional approach a step further by conducting an approving advisory review of the independent map drawers' incomplete plan, which the map drawers have not even reviewed to verify whether it complies with the Ohio Constitution, as acknowledged in the majority opinion. *See* majority opinion at ¶ 70. Again, this advisory review contravenes longstanding precedent from this court. *See Egan* at syllabus ("it is well-settled that this court will not indulge in advisory opinions"); *Miner v. Witt*, 82 Ohio St. 237, 238, 92 N.E.21 (1910), quoting *Mills v. Green*, 159 U.S. 651, 653, 16 S.Ct. 132, 40 L.Ed. 293 (1895) (" 'The duty of this court, as of every other judicial tribunal, is to decide actual controversies by a judgment which can be carried into effect, and not to give opinions upon moot questions or abstract propositions * * *' ").

{¶ 121} Not only does the majority opinion conduct an advisory review, but it also tries to "signal" to the commission what type of redistricting plan it demands, *see* majority opinion at ¶ 69-74, because the court knows that it cannot directly create a plan under Article XI. Article XI, Section 9(D)(1) and (D)(2). And this

court cannot indirectly do, via signaling, what it cannot do directly. *See Suon v. Mong*, 10th Dist. Franklin No. 17AP-879, 2018-Ohio-4187, ¶ 16; *State v. Jamison*, 2d Dist. Montgomery No. 23211, 2010-Ohio-965, ¶ 37; *Tarr v. Walter*, 7th Dist. Jefferson No. 01 JE 7, 2002-Ohio-3188, ¶ 31.

## IV. Once again, the "beyond a reasonable doubt" standard has not been met

{¶ 122} I also point out that petitioners once again fail to prove anything beyond a reasonable doubt, which is the applicable standard in these cases. *League III*, ___ Ohio St.3d ___, 2022-Ohio-789, ___ N.E.3d ___, at ¶ 153-154 (Fischer, J., dissenting), citing *League I*, ___ Ohio St.3d ___, 2022-Ohio-65, ___ N.E.3d ___, at ¶ 339-340 (Fischer, J., dissenting), citing *Wilson v. Kasich*, 134 Ohio St.3d 221, 2012-Ohio-5367, 981 N.E.2d 814, ¶ 20.

{¶ 123} As an initial example, Dr. Douglas Johnson's affidavit, as even today's majority opinion notes, majority opinion at ¶ 33, shows that the independent map drawers were constrained by Ohio's geography, Constitution, and time limitations. And one of the map drawers had to leave at the last minute. And the so-called independent maps have obvious constitutional problems, which Dr. Johnson acknowledged still needed to be resolved. It should be emphasized that the commission members did not have an opportunity to incorporate their own amendments into Dr. Johnson's work. Moreover, the "independence" of this map is dubious, as Dr. Johnson acknowledged that he used a portion of a map of northeast Ohio that was drawn by Chris Glassburn, a consultant who had been retained by the Democratic legislative caucuses. Thus, any evidentiary analysis in the majority opinion as to the maps that were submitted is wrongful, improper, and unconstitutional under our caselaw as well as Article XI.

{¶ 124} As a second example, the majority opinion attempts to rely on Dr. Michael Latner's concept of a "2 percentage" change in future voting. Majority opinion at ¶ 51. This is, at best, pure speculation because the shift of 2 percentage points may not be equally distributed as current voting patterns occur, just like the

geographic distribution of Ohio voters is "all over the place," as recognized by Dr. Michael McDonald, and no one may reasonably predict how local issues, especially local tax-increase issues and other local initiatives and referenda, can "tweak" the whereabouts of changes in locations of voter turnout. Moreover, the record includes contrary viewpoints on this subject, i.e., under a 5 percent future vote-change concept.

{¶ 125} Now, both concepts are speculative, at best, and based on *in futuro* concepts that are inadmissible under Ohio's Rules of Evidence. Neither should be accepted by this court without proper cross-examination.

{¶ 126} But even if not speculative and somehow admissible, *both* theories would then apply to this court's analysis. And if those pushing the 2 percent concept have the burden to show unconstitutionality beyond a reasonable doubt, then those submitting the 5 percent contrary authority negate the evidence supposedly amounting to proof beyond a reasonable doubt. In addition, while the majority opinion relies on the assertion that the map drawers were nearly finished with completing a map when commission members decided to move forward with an alternative approach, *see* majority opinion at ¶ 23, no one has offered an explanation why it took until April 12 for a so-called independent map to be filed with this court, *see* April 12, 2022 Notice of Filing, case No. 2021-1198. Once again, just like the prior majority opinions, the majority opinion here touts the proper standard of evidence but then refuses to actually enforce that standard. *See League I*, ___ Ohio St.3d ___, 2022-Ohio-65, ___ N.E.3d ___, at ¶ 343 (Fischer, J., dissenting); *League III*, ___ Ohio St.3d ___, 2022-Ohio-789, ___ N.E.3d ___, at ¶ 154 (Fischer, J., dissenting).

## V. Conclusion

{¶ 127} The majority opinions in these cases continue to harm this court, the Ohio Constitution, and all citizens of this great state. These opinions have placed this state on an unconstitutional path. While this latest majority opinion asks

the federal court to stay its hand, in reality, it may take federal intervention to place Ohio back "enroute" because the extraconstitutional—and thus unconstitutional—analysis embraced in the majority opinions prevents a return to Ohio's actual constitutional road. *See League II*, ___ Ohio St.3d ___, 2022-Ohio-342, ___ N.E.3d ___, at ¶ 151 (Fischer, J., dissenting). By ignoring its constitutional limitations, usurping authority it lacks, and violating the separation-of-powers doctrine inherent in the Ohio Constitution, *Picklo*, 96 Ohio St.3d 195, 2002-Ohio-3995, 772 N.E.2d 1187, at ¶ 4, the majority opinions in these cases have gotten this court stuck in the mud. If the federal court does not tow this court out of that mud, these cases may be relitigated and relitigated, over and over, all year.

{¶ 128} For these reasons, in the hope of saving this honorable court from future misadventures like these, I respectfully dissent. *See Lewis*, 99 Ohio St.3d 97, 2003-Ohio-2476, 789 N.E.2d 195, at ¶ 32-33 (once a legislative act has been declared unconstitutional, the duty lies with the legislative branch to remedy that unconstitutional act and the courts should refrain from exercising further jurisdiction).

_____

**DEWINE, J., dissenting.**

{¶ 129} It's déjà vu all over again.[12] For the fourth time, the majority holds that a map enacted by the Ohio Redistricting Commission violates the Ohio Constitution. That's what it says, anyway. But if anything is clear at this point, it is that the majority has long ago forsaken any concern about the actual words of the Constitution—it simply demands a General Assembly–district plan that achieves its policy goals.

{¶ 130} With each iteration of these cases, it becomes more evident that a rogue majority is simply exercising raw political power. No one should be

_____

12. Yogi Berra.

deceived.  The document that the majority issues today may be in the "form of a judicial opinion," *Bostock v. Clayton Cty*., __ U.S. __, __, 140 S.Ct. 1731, 1754, 207 L.Ed.2d 218 (2020) (Alito, J., dissenting), but what the majority does today is legislate, not adjudicate.

{¶ 131} A more comprehensive discussion of how the majority has gone astray is provided in the dissenting opinions in the previous decisions in these cases. *See League of Women Voters of Ohio v. Ohio Redistricting Comm*., ___ Ohio St.3d ___, 2022-Ohio-65, ___ N.E.3d ___; *League of Women Voters of Ohio v. Ohio Redistricting Comm*., ___ Ohio St.3d ___, 2022-Ohio-342, ___ N.E.3d ___ ("*League II*"); *League of Women Voters of Ohio v. Ohio Redistricting Comm*., ___ Ohio St.3d ___, 2022-Ohio-789, ___ N.E.3d ___ ("*League III*").  For today, I will make just a few points.

## I. *We have a mess on our hands because this court has ignored the constitutional limits on its authority*

{¶ 132} Ohio will have two primary elections this year, costing taxpayers an estimated extra $20 to $25 million.  Candidates and voters still have no idea which candidates will be running in which districts.  And a federal court is weighing whether it needs to step in and save us from ourselves.

{¶ 133} All of this was easily avoidable.  The Ohio Constitution explicitly provides that "if the supreme court of Ohio determines that a general assembly district plan adopted by the commission does not comply with the requirements of *Section 2, 3, 4, 5, or 7* of this article," this court may order the commission to reconvene and adopt a new map.  (Emphasis supplied.)  Article XI, Section 9(D)(3). The alleged violations here—related to statewide proportionality and excessive partisanship—are all premised on *Section 6*.  There is nothing in the Constitution that gives this court authority to order the commission to create a new district plan based on violations of Section 6.  Rather, if Republicans and Democrats fail to cooperate and adopt a plan that both political parties consider fair, the Ohio

Constitution provides a nonjudicial remedy: a plan that lasts only four years instead of ten. *See id.* at Section 8(C)(1)(a).

{¶ 134} It may be that the architects of the General Assembly–redistricting amendment were overly optimistic. Perhaps the threat of a plan lasting only four years was not the stick it was thought to be to induce partisan political actors to cooperate. But that is the remedy provided by the Constitution—this court has no authority to make up one of its own. And now Ohio's citizens are paying in electoral chaos the price of this court's overreach.

## II. *The majority's extraconstitutional hostility toward competitive districts*

{¶ 135} The Constitution says that the commission "shall attempt to draw a general assembly district plan" in which "[t]he statewide proportion of districts whose voters, based on statewide state and federal partisan general election results during the last ten years, favor each political party shall correspond closely to the statewide preferences of the voters of Ohio." Article XI, Section 6(B). Without question, the commission not only attempted to meet, but actually met, this standard. Both the third and now the fourth enacted plans contain districts that precisely achieve this metric, with 54 Republican-leaning House districts and 45 Democratic-leaning House districts and an 18-to-15 ratio in the Senate.

{¶ 136} The majority, though, has created a new standard—"partisan symmetry," majority opinion, ¶ 75—found nowhere in the Constitution. It says that competitive districts " 'must either be excluded from the proportionality assessment or be allocated to each party in close proportion to its statewide vote share.' " *Id.* at ¶ 57, quoting *League II*, ___ Ohio St.3d ___, 2022-Ohio-342, ___ N.E.3d ___, at ¶ 62. But why? And how? There is certainly no basis for this requirement in the text of the Constitution. And no one has shown that it is even possible to meet this judge-crafted standard.

{¶ 137} Indeed, the "independent map drawers" that the commission hired on the majority's instructions, *League III*, ___ Ohio St.3d ___, 2022-Ohio-789, ___

N.E.3d \_\_\_, at ¶ 30 ("The commission should retain an independent map drawer"), didn't do much better at achieving this extraconstitutional metric than the commission. Not only did the independent map drawers fail to complete their work by this court's deadline, but they made only modest gains in reducing partisan asymmetry. For example, in finding the third enacted plan unconstitutional, the majority relied on expert testimony that "a 5 percent uniform swing in favor of the Republican Party across all [House] districts would result in up to 23 additional Republican seats, while the same swing in favor of the Democratic Party would result in a gain of, at most, two seats." *Id.* at ¶ 33. Under the incomplete plan drawn by the independent map drawers, a 5 percent Republican swing would result in 21 additional Republican seats while the same swing in favor of the Democratic Party would result in only 6 additional Democratic seats.

{¶ 138} And the limited progress the independent map drawers made toward the majority's made-up partisan-symmetry benchmark came at the expense of constitutional requirements governing compactness and keeping political subdivisions intact. Dr. Douglas Johnson, one of the independent map drawers, explained that in their "quest to get as close to symmetry" as possible, they were "kind of blowing through compactness."

{¶ 139} As Speaker of the House Robert Cupp and President of the Senate Matt Huffman point out, the independent map drawers used a "hub and spoke" approach to draw districts in urban and suburban areas so that cities are carved up like slices of a pizza. The majority doesn't dispute this characterization. (How could it?) Rather, it says respondents "cite no evidence or authority for the proposition that the 'hub and spoke' districts they describe are not compact." Majority opinion at ¶ 54. No evidence? How about a simple eyeball test? Take a gander at a few examples of the independent map drawers' work in Cincinnati, Akron, and Dayton:





{¶ 140} The Constitution requires that district boundaries be created "using the boundaries of counties, municipal corporations, and townships." Article XI, Section 7. And the commission "shall attempt" to draw districts that are "compact." Section 6(C). Does anyone really believe that slicing up metropolitan areas like a pizza with no concern for political-subdivision boundaries meets these requirements? Of course not. But that's exactly the process the majority has foisted upon the commission.

{¶ 141} The work of the independent map drawers proves the lie of the majority's premise. As every expert in this case—including the independent map drawers—to opine on the issue has acknowledged, the political geography of Ohio makes it nearly impossible to meet the majority's requirement to achieve partisan symmetry in the makeup of competitive districts. *See League III*, ___ Ohio St.3d

___, 2022-Ohio-789, ___ N.E.3d ___, at ¶ 90 (Kennedy and DeWine, JJ., dissenting). The majority's answer is to require the commission to reverse-gerrymander (or hire map drawers who will)—that is, carve up Ohio's metropolitan areas like a pie to maximize the number of solidly Democratic districts. In doing so, it commands exactly what the Constitution forbids: gerrymandering.

{¶ 142} The majority turns the language of Article XI, Section 6(A)—"[n]o general assembly district plan shall be drawn primarily to disfavor or favor a political party"—on its head. It orders the commission to draw maps with a single objective: overcoming Ohio's political geography through the creation of safe districts that guarantee Democratic wins. That may meet the policy objectives of some, but it has no basis in the text of the Ohio Constitution.

### III. *This court has no authority to direct the commission's work or to advise its duties*

{¶ 143} Likely fearing that an activist court would do exactly what the majority has done, the drafters of the redistricting amendment placed sharp limits on this court's authority. In its first sentence, the amendment commands that the redistricting commission "*shall be responsible* for the redistricting of this state for the general assembly." (Emphasis supplied.) Article XI, Section 1(A). And in a belt-and-suspenders approach, it provides further: "No court shall order, *in any circumstance*, the implementation or enforcement of any general assembly district plan that has not been approved by the commission in the manner prescribed by this article." (Emphasis supplied.) *Id.* at Section 9(D)(1). And if that weren't enough to get the point across, the amendment adds that "[n]o court shall order the commission to adopt a particular general assembly district plan or to draw a particular district." *Id.* at Section 9(D)(2). Further, this court may order the commission to revise or draw a new map only for certain violations of objective standards. *See id.* at Section 9(D)(3). (The majority, of course, has long since blown past this last restraint.)

64

{¶ 144} Despite these limits, the majority has repeatedly attempted to micromanage the commission's work, imposing requirements found nowhere in the Constitution. For example, one of the reasons the court gave in *League III* for finding the plan unconstitutional was a purported violation of Article XI, Section 1(C), which provides: "The commission shall draft the proposed plan in the manner prescribed in this article." According to the majority, "the commission has adopted three plans so far, but it still has not drafted one." (Emphasis deleted.) *League III*, ___ Ohio St.3d ___, 2022-Ohio-789, ___ N.E.3d ___, at ¶ 25. Thus, the majority directed the commission to "retain an independent map drawer" and ordered the commission to produce a new map within 12 days. *Id.* at ¶ 30, 45.

{¶ 145} Heeding the majority's admonition, the commission hired two independent map drawers. It's hard to see how a map drafted by independent map drawers would any more comply with the majority's requirement that the plan be *drafted by the commission* than the previous plans that were drafted by staff and adopted by a majority vote of the commission. After all, neither would be drafted collectively by the commission. But the commission nonetheless did what it was told. And while the independent map drawers made substantial progress in drafting a plan, they were not able to comply with the arbitrary 12-day deadline this court had set.

{¶ 146} One might think that the majority would have learned a lesson about imposing arbitrary deadlines on an independent constitutional body. Apparently not. Instead, it engages in a remarkable bit of revisionist history. The majority acknowledges that the independent map drawers were unable to meet this court's deadline. But instead of recognizing the failure of its attempt to micromanage the commission's work, it faults the commission for not asking for an extension of the deadline. And it goes so far as to claim that Senate President Huffman and House Speaker Cupp misread *League III* when they told the

commission that this court had said that no requests for an extension would be entertained.

{¶ 147} But that is exactly what *League III* provided. Paragraph 45 of *League III*, ___ Ohio St.3d ___, 2022-Ohio-789, ___ N.E.3d ___, ordered the commission to file the district plan with the secretary of state no later than March 28 and with this court by 9:00 the next morning. Paragraph 46 ordered objections to be filed no more than three days later. And paragraph 47 provided that "[n]o requests or stipulations for extension of time shall be filed, and the clerk of this court shall refuse to file any requests or stipulations for extension of time." The majority now says that "it is not proper to read paragraph 47 in isolation; it should be read in context. And in the paragraph prior to paragraph 47, we stated that untimely filings 'under this paragraph' were prohibited." Majority opinion at ¶ 40, fn. 8. That's nonsense. If paragraph 47 was meant to be a continuation of paragraph 46, there would have been no need to make it a separate paragraph at all. By making paragraph 47's no-extensions order into a separate paragraph and placing it immediately after the two paragraphs setting deadlines, it is clear that the court meant no extensions would be granted. Period.

## IV. The majority's cavalier approach to Ohio election law and the duties of Ohio's election officials

{¶ 148} The majority spends a good portion of its opinion practically begging a federal court not to intervene and clean up the mess that the majority has created. At the same time, though, the majority inspires little confidence that it will allow the state of Ohio to conduct an orderly election. To the contrary, it cavalierly treats Ohio's statutory framework for elections as an unnecessary nuisance and disregards the complexities of holding multiple elections in a short time frame.

{¶ 149} In addition to the regular May primary in non-presidential-election years and the November general election, R.C. 3501.01(E)(1) and (A), Ohio law provides that a special election may be held on the first Tuesday after the first

66

Monday in August, R.C. 3501.01(D).  The majority, though, treats the statutorily prescribed special date as a mere suggestion:

> We are mindful of representations made by or on behalf of the secretary of state in the pending *Gonidakis* federal-court proceedings that a district plan must be in place by April 20 for the last possible primary-election date for the 2022 election, August 2, to be feasible.  However, *we fail to see how this contention should motivate us*—or the federal court for that matter—to adopt a plan for the 2022 state legislative elections by April 20.  It is unclear as to why August 2, 2022, is the last available date for a primary election in Ohio.  We note that several states have primary elections on August 16, 2022, or later, including four states that will have their primary elections in September.  Thus, on the record before us, the so-called April 20 "deadline" for implementing a General Assembly–district plan appears to be *an artificial deadline that is based on a speculative, potential primary-election* date for state legislative races.

(Emphasis supplied; footnote and citation omitted.)  Majority opinion at ¶ 68, citing *Gonidakis v. Ohio Redistricting Comm.*, S.D.Ohio case No. 2:22-cv-0773.  Wow. Take a minute to unpack what the majority has just said.

{¶ 150} Start with the majority's assertion that this court shouldn't be "motivated" by deadlines based on election dates established by statute.  That right there pretty much sums up the majority's attitude about the other—supposedly coequal—branches of government.  The legislature's considered judgment about when to hold elections matters not; there is no reason to bother the court with such frivolities.  *But see* R.C. 3501.40 ("no public official shall cause an election to be

conducted other than in the time, place, and manner prescribed by the Revised Code").

{¶ 151} Next, consider the majority's characterization of the secretary of state's representation that to hold an orderly election, districts must be finalized by April 20. The majority brushes this off as "an artificial deadline that is based on a speculative, potential primary-election date for state legislative races." Majority opinion at ¶ 68. What possibly is the basis for this claim by the majority? The majority hasn't asked for any evidence on this point from the secretary of state, the "chief election officer of the state," R.C. 3501.04. And the only thing the majority points to in support of its bluster is the fact that a few other states—which presumably have different election systems and laws—hold later elections.

{¶ 152} Indeed, the majority does not even try to account for the myriad laws that govern elections in Ohio and the constraints that they impose on the timing of elections. For example, under the Uniformed and Overseas Citizens Absentee Voting Act, 52 U.S.C. 20302, overseas ballots must be printed and prepared 46 days before the primary election. R.C. 3509.01(B)(1); R.C. 3511.04(B). After the primary election is held, there is a 20-day period in which overseas ballots may be received. 2022 Am.Sub.S.B. No. 11, Section 5(B)(1). Provisional ballots may not be opened until 7 days after an election, *see* R.C. 3505.183, and the election results are not certified until 21 days after the election. 2022 Am.Sub.S.B. No. 11, Section 5(D). And, of course, general-election ballots cannot be prepared until the primary election results are certified and it is determined who the candidates are. Under federal law, overseas general-election ballots must be printed and mailed 45 days before the general election. 52 U.S.C. 20302(a)(8)(A); *see also* R.C. 3511.04(B) (46 days). Early voting begins 29 days before the general election. *See* R.C. 3509.01(B).

{¶ 153} Then there are the practical difficulties in holding another primary election close in time to the general election. Ohio had some 3,563 polling places

in 2020.[13]   Poll workers need to be recruited, hired, and trained to staff these locations.  R.C. 3501.27(B) and (D).  Ballots need to be printed.  *See generally* R.C. 3505.08; R.C. 3505.13.   Voting machines need to be programmed.   *See* R.C. 3506.14.   Presumably, a good number of localities will hold an August special election as provided by statute.  *See* R.C. 3501.01(D).  These localities will face the additional challenges inherent in holding three separate elections within a four-month period.

{¶ 154} (And let's not forget why we have elections in the first place.  The voters are entitled to the information they need to make meaningful choices.  That entails some period of time in which voters and candidates know the district lines so candidates can campaign and voters can assess the candidates.)

{¶ 155} To be fair, I can't say with certainty that what the majority suggests is impossible.  But the majority cannot fairly say that it is possible.  We are judges, after all, not election officials.  We have no institutional expertise in the mechanics of holding elections.  And the person who does—Ohio's secretary of state—has made clear that he thinks April 20 is the drop-dead date for holding an orderly election.  There is nothing in the record before us that would suggest that that is untrue.  This court is no better qualified to dispute the administrative calculus of Ohio's chief election official than is the secretary of state to tell this court the meaning of the Ohio Constitution.  *See* majority opinion at ¶ 36 ("We do not defer to the commission's legal interpretations").

{¶ 156} At this juncture, though, the majority's dismissive attitude toward the practical concerns of holding an orderly election should hardly come as a

---

13. *See* U.S. Election Assistance Commission, *Election Administration and Voting Survey 2020 Comprehensive Report*, available at https://www.eac.gov/sites/default/files/document_library/files /2020_EAVS_Report_Final_508c.pdf#page=29 (accessed Apr. 14, 2022) [https://perma.cc/TN9T-G4R2] and *Election Administration and Voting Survey 2020 Datasets Version 1.1*, available at https://www.eac.gov/research-and-data/datasets-codebooks-and-surveys (accessed Apr. 14, 2022) [https://perma.cc/AX9A-XV6X].

surprise. Throughout this litigation, the majority has shown little concern for the realities facing the commission and election officials. On the first three go-rounds, this court gave the commission ten, ten, and twelve days, respectively, to adopt a new plan. In contrast, the court allowed itself a leisurely 111 days to review the first enacted plan, 13 days to review the second enacted plan, 16 days to review the third enacted plan, and now 13 days to review the fourth plan. Today, the majority is a little more generous in the time it gives the commission to draft a new plan. But that "generosity" comes late—perhaps too late—in the game.

{¶ 157} Furthermore, the majority has made the commission's task considerably more difficult by prohibiting it from using a previously invalidated plan as a starting point. *See id.* at ¶ 78 ("We further order * * * that the commission draft and adopt an entirely new General Assembly–district plan"); *see also League II*, ___ Ohio St.3d ___, 2022-Ohio-342, ___ N.E.3d ___, at ¶ 38. In the eyes of the majority, issuing a revised plan that is "no more than a modification" of a previously invalidated plan, majority opinion at ¶ 42, is " 'tantamount to an intent to preserve as much partisan favoritism as could be salvaged from the invalidated plan,' " *id.* at ¶ 41, quoting *League II* at ¶ 38. Why on earth should that be the case? Isn't it conceivable that a few tweaks could fix a close-but-not-quite-good-enough plan? Nonetheless, it seems that the commission has only two options that will satisfy the majority: either try to fix the independent map drawers' slice-and-dice plan or start entirely from scratch. What basis for that is there in the Constitution?

{¶ 158} Indeed, it is amazing that despite prohibiting the commission from working off its previous plan, the majority has no qualms about strongly suggesting that the commission work from the independent map drawers' plan—a plan that has never been adopted or subjected to adversarial testing. The majority tells the commission that it "appears that the most efficient" course is for the independent map drawers to continue to work on the map and it provides various other guidance about how the commission should proceed. Majority opinion at ¶ 74. This court,

however, is forbidden from "order[ing] the commission to adopt a particular general assembly district plan." Article XI, Section 9(D)(2). In defiant disregard of that proscription, the majority prejudges a plan yet to be adopted and strongly implies that any alternative will be frowned upon. The majority's insistence on telling the commission how to do its job is simply more evidence of how far away the majority has gotten from its own.

### *V. Conclusion*

**{¶ 159}** This court's job is to adhere to the text of the Constitution. It is not to impose extraconstitutional standards on the commission in an attempt to achieve political outcomes that the court finds desirable. And it is not to micromanage a task that the Constitution entrusts solely to the commission.

**{¶ 160}** If it is really true that history repeats itself, first as tragedy then as farce, we are now comfortably in the farce stage. The fourth enacted plan complies with all constitutional standards. It is long past time for the majority to acknowledge as much and put an end to the chaos it has created. Because the majority does not, I respectfully dissent.

KENNEDY, J., concurs in the foregoing opinion.

FISCHER, J., concurs in paragraphs 151-152 and paragraphs 157-158 of the foregoing opinion.

_____

ACLU of Ohio Foundation, Inc., Freda J. Levenson, and David J. Carey; American Civil Liberties Union, Alora Thomas, and Julie A. Ebenstein; and Covington & Burling, L.L.P., Robert D. Fram, Donald Brown, Joshua González, Juliana Goldrosen, David Denuyl, Alexander Thomson, Anupam Sharma, and Yale Fu, for petitioners in Supreme Court case No. 2021-1193.

McTigue, Colombo & Clinger, L.L.C., Donald J. McTigue, and Derek S. Clinger; and Elias Law Group, L.L.P., Abha Khanna, Ben Stafford, Jyoti Jasrasaria,

Spencer W. Klein, Harleen K. Gambhir, and Raisa M. Cramer, for petitioners in Supreme Court case No. 2021-1198.

Reed Smith, L.L.P., Peter M. Ellis, M. Patrick Yingling, Brian A. Sutherland, Ben R. Fliegel, Brad A. Funari, and Danielle L. Stewart; and Brennan Center for Justice at New York University School of Law, Alicia L. Bannon, Yurij Rudensky, and Harry Isaiah Black, for petitioners in Supreme Court case No. 2021-1210.

Dave Yost, Attorney General, and Organ Law, L.L.P., Erik J. Clark, and Ashley T. Merino, special counsel to Attorney General Dave Yost, for respondent Ohio Redistricting Commission.

Dave Yost, Attorney General, and Zeiger, Tigges & Little, L.L.P., John W. Zeiger, Marion H. Little Jr., and Christopher J. Hogan, special counsel to Attorney General Dave Yost, for respondent Ohio Governor Mike DeWine.

Dave Yost, Attorney General, Jonathan D. Blanton, Deputy Attorney General, Michael J. Hendershot, Deputy Solicitor, and Julie M. Pfeiffer and Michael A. Walton, Assistant Attorneys General; and Dickinson Wright, P.L.L.C., David A. Lockshaw Jr., Terrence O'Donnell, and Manuel D. Cardona, for respondent Ohio Secretary of State Frank LaRose.

Bricker & Eckler, L.L.P., Brodi J. Conover, and Anne Marie Sferra, for respondent Auditor of State Keith Faber.

Dave Yost, Ohio Attorney General, and Taft, Stettinius & Hollister, L.L.P., W. Stuart Dornette, Beth A. Bryan, and Philip D. Williamson, and Nelson, Mullins, Riley & Scarborough, L.L.P., Phillip J. Strach, Thomas A. Farr, John E. Branch III, and Alyssa M. Riggins, special counsel to Attorney General Dave Yost, for respondents Senate President Matt Huffman and Speaker of the House Robert Cupp.

Cooper & Elliott, L.L.C., C. Benjamin Cooper, Charles H. Cooper Jr., and Chelsea C. Weaver, for respondents Senator Vernon Sykes and House Minority Leader Allison Russo.

————————